**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

MYRON JIM HARRY,

      Defendant - Appellant.

No. 14-2160

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. 1:10-CR-1915 JB-1)**

John F. Moon Samore, Law Office of John Moon Samore, P.C., Albuquerque, New Mexico, for Defendant-Appellant.

James R.W. Braun, Assistant United States Attorney (Damon P. Martinez, United States Attorney), United States Attorney's Office, Albuquerque, New Mexico, for Plaintiff-Appellee United States of America.

Before **HARTZ**, **GORSUCH** and **PHILLIPS** Circuit Judges.

**HARTZ**, Circuit Judge.

Defendant Myron Harry appeals his conviction of sexual assault at the home of friends while the victim was sleeping after a party. He challenges his conviction on three grounds.

The first challenge relates to text messages between Defendant and one of his hosts immediately after the assault. All but one of his messages were used against him at trial. None of the host's messages, however, were presented by the government. Defendant claims that his right to due process was violated by the failure to preserve text messages sent to him by the host, whose cell phone had been provided to officers as evidence. We reject the claim because the messages were not apparently exculpatory before they were lost, in retrospect they were not exculpatory, and the district court properly found that the officers had not acted in bad faith.

The other two challenges relate to the district court's grant of the government's pretrial motion in limine to exclude any evidence that the victim flirted with Defendant during the party. Defendant claims that the district court improperly excluded from trial one of his text messages, which, he argues, indicated that the victim had been flirting with him during the party. We reject the claim because the court correctly held that the text message was hearsay and the rule of completeness did not require that it be admitted to explain the other messages. Defendant also claims that the district court improperly excluded flirting testimony from any witness other than Defendant himself. We reject the claim because there is no evidence that Defendant was prejudiced by the ruling. He made no proffer of what evidence could have been admitted, probably because there was none.

2

Although he took the stand in his own defense at trial, he did not testify about any flirting; and the only other person present at the party who had been asked about flirting (at a pretrial hearing) denied that it had occurred. The court's order granting the motion in limine invited Defendant to reopen the issue at trial, but he did not do so.

Finally, we reject Defendant's claim that his sentence was substantively unreasonable.

## I.     BACKGROUND

Most of the relevant facts were undisputed at trial. On May 5, 2010, Defendant attended a party at the apartment of Stephanie Johnson and her boyfriend Dimitri Sanisya. Among the guests were Elysia Murphy and the victim, Alanna Yazzie. Defendant was a good friend of Mr. Sanisya but had not known Ms. Yazzie.

Because the guests were drinking, the hosts allowed them to spend the night, designated a bedroom for the women, and assigned the male guests to the living room. Ms. Murphy retired to the women's bedroom at about 2 a.m. Later Ms. Yazzie joined her, lying down next to her on an air mattress.

About 5 a.m., Mr. Sanisya fell, creating a loud noise that woke Ms. Johnson. When she checked to see what had happened, she saw that Defendant and Mr. Sanisya were drunk and still awake. She told them to go to bed. Defendant went to lie down in the living room. He testified that he then decided to go home and went to the bedroom of Mr. Sanisya and Ms. Johnson to say that he was leaving. At that point Ms. Johnson got

3

up to use the bathroom. She testified that on her way she opened the door to the women's bedroom, saw Ms. Murphy and Ms. Yazzie (and a third friend) sleeping within, and closed and locked the door. She then went on to the bathroom.

According to Defendant, when Ms. Johnson went to the bathroom he "decided to check on Alanna" to "let her know I was leaving" and entered the women's bedroom. R., Doc. 251 at 52–53. His manner of entry is disputed. He testified that the door was unlocked. But other evidence suggested that he took an employee name tag from a drawer in the apartment and used it to breach the locked door.

At trial Defendant gave the following account of what happened after he entered: He approached Ms. Yazzie but before he could explain to her that he was going to go home, she grabbed him and pulled him closer. The two began kissing and Ms. Yazzie grabbed his belt buckle, trying to remove it. She lowered her panties, and Defendant pulled down his pants and positioned himself to have intercourse with her on the air mattress.

This activity awoke Ms. Murphy. Seeing Defendant on top of Ms. Yazzie, who appeared to be asleep, she said to Defendant: "What are you doing? Get out." R., Doc. 251 at 58. Ms. Yazzie testified that she "woke up with somebody on top of me and kissing me" and having intercourse with her and that "before I knew it" Ms. Murphy woke up and told Defendant to leave. R., Doc. 250 at 16. Although Defendant testified that he was unsure whether he had actually begun intercourse, DNA results from Ms. Yazzie corroborated her statement.

4

Defendant apologized, pulled up his pants, and left the bedroom to go to the bathroom. On his way out of the bathroom he was confronted by the women, who had been discussing what had happened and began "screaming and shouting" at him. R., Doc. 251 at 60. They told him to go. He apologized and left.

The commotion awoke Mr. Sanisya, who was informed of the events by the other guests. He then began to exchange text messages with Defendant. Only the messages sent by Defendant are available; those sent by Mr. Sanisya have been lost.

Navajo Nation Investigator Jefferson Joe first interviewed Defendant on May 12, six days after the incident. At the interview Defendant said that he knew he was being questioned because of "allegations that [he] raped a person." R., Doc. 250 at 243. He told Joe that he never entered the women's bedroom. During the interview Joe first learned that Defendant had exchanged text messages with Mr. Sanisya after the assault. Defendant did not at that time indicate that he had sent any exculpatory messages. He told Joe:

> They got my keys, and I finally got in my car, and I was sitting there for a while, then my friend, Dimitri, was texting me, and telling me, "How could you do this? I was your friend. How could you do this to me?" And I was like, "What did I do, Dimitri?"
>
> "[Ms. Yazzie] -- or somebody said you raped [Ms. Yazzie]. You know, [Ms. Murphy] said she saw you."
>
> I said, "Okay." And I was confused and I was drunk, sometimes I don't know what to think. I was thinking like was it midnight or not (inaudible). It's just that point in time where I was out. And I don't know what was going on. All I remember was waking up at that time and helping these girls take Dimitri to his room.

5

So I was texting him back, and I told him, I said, "Well, I'm sorry for what I did. And I don't know what happened, but if [Ms. Yazzie] said I raped her, then I don't know, I'm not going to say nothing about that. Just tell her that I'm sorry, and I'm not in my right mind," I told him that.

R., Doc. 236 at 53–54. Joe made no effort to examine Defendant's phone.

Nine days later, on May 21, Joe went to Mr. Sanisya's apartment to ask him about the text messages. During the interview Mr. Sanisya did not say anything tending to exculpate Defendant. The two looked at the texts on Mr. Sanisya's phone. Unlike more modern phones, which display incoming and outgoing messages in a single conversation view, Mr. Sanisya's phone had a separate inbox and outbox for incoming and outgoing text messages. There is conflicting evidence about whether Mr. Sanisya's outgoing messages were still on his phone on May 21. Mr. Sanisya testified at the pretrial suppression hearing that when he and Joe looked at his phone, both sides of the text-message exchange were there. Joe testified that he did not see Mr. Sanisya's outgoing messages. The district court, reasoning that Joe likely did not recall viewing Mr. Sanisya's messages because his investigative focus was on the messages sent by Defendant, found that Mr. Sanisya's testimony was accurate.

Joe collected Mr. Sanisya's phone that day and stored it as evidence. From that phone, investigators recovered the following "inbox" text messages from Defendant to Mr. Sanisya just after the assault (the timing of each message as recorded by the cellular network is added in brackets):

6

1. "Whats going on? Im lost!"[1] [5:36 a.m.]

2. "Im sorry 4 what I did. I didnt want 2 disrespect u in ur home. Thats all I can say. Im sorry." [5:53 a.m.]

3. "Ok. I know u dnt. Ill guess I have 2 accept the charges. I still love u guys though." [6:05 a.m.]

4. "Ok. Im sorry." [6:15 a.m.]

5. "I knw. Im sorry." [6:23 a.m.]

6. "I knw. She was all over me the whole nite. I remember that." [6:29 a.m.]

7. "Well tell bean [a nickname for Ms. Yazzie] that Im sorry n That I am an idiot n a stupid mafucker. Im sorry. I wasnt in my right mind 2 do that 2 her. Im stupid. Thats all I can say." [6:37 a.m.]

8. "I knw. It was me. I messed up. I should have known better. Im sorry." [6:41 a.m.]

R., Doc. 179 at 27–29.  All but #6 (which we shall refer to as the "all over me" text) were admitted at trial.

Despite several recovery efforts, the messages sent by Mr. Sanisya have been lost. Shortly after his interview with Mr. Sanisya, *see* R., Doc. 179 at 46 ("that same day or maybe a few days after I interviewed Dimitri")—which was 15 days after the text-message exchange—Investigator Joe sought backup copies of the messages from Mr. Sanisya's phone company; but he was informed that it did not store messages after two weeks.  Next, Joe took the phone to the Farmington police department, which had

---

[1] Most of the messages ended with what was apparently Defendant's "signature": "ilmygirls :]."

7

software for retrieving data from cell phones.  But it was unable to retrieve the outgoing messages.

Within a month of these failed attempts, on June 24, 2010, Defendant was indicted on a single count of sexual abuse in Indian country under 18 U.S.C. §§ 1153, 2242(2), and 2246(2)(A).  After receiving copies of Defendant's messages from the prosecution, defense counsel in early July requested that the prosecution turn over the messages sent by Mr. Sanisya.  The prosecution informed counsel that the messages were unavailable.

Two years after the request for the messages, on June 26, 2012, Defendant filed a pretrial motion to suppress the text messages that he had sent to Mr. Sanisya.  He argued that because the government possessed but failed to preserve the messages sent by Mr. Sanisya, the district court should suppress the messages sent by Defendant.  Apparently in response to the motion, in July 2012, Investigator Joe brought Mr. Sanisya's phone to a cell-phone forensics examiner used by the FBI, named Jeremy Guilmette.  Mr. Guilmette examined the phone and concluded that it did not contain the outgoing messages.

The district court then conducted a hearing on September 19, 2012, with testimony from Mr. Sanisya, Ms. Johnson, Investigator Joe, and Mr. Guilmette.  On February 19, 2013, the court denied the motion.

One question at the hearing led to an additional dispute.  Defense counsel asked Mr. Sanisya whether Ms. Yazzie had flirted with Defendant on the evening of the party.  Mr. Sanisya stated that he did not recall any flirting, but the question prompted the government to file a motion in limine eight days later.  Relying on Federal Rule of

8

Evidence 412—which provides that evidence of a victim's sexual behavior and sexual predisposition ordinarily is inadmissible—it sought to exclude evidence of Ms. Yazzie's sexual past. At the initial hearing on the motion, held March 29, 2013, the prosecution said that it sought to exclude any evidence that Ms. Yazzie had flirted with Defendant on the night of the party. At a second hearing on April 10, the prosecution further stated that its motion encompassed the "all over me" text sent by Defendant. The prosecution also stated that notwithstanding its motion, "[Defendant] is free to hit the witness stand and talk all day about how [Ms. Yazzie] was hitting on him all night." R., Doc. 177 at 18.

Defendant argued that evidence of flirting on the night of the party fell outside the prohibition of Rule 412. He also argued that under the rule of completeness the district court should allow into evidence the "all over me" text along with Defendant's other texts. He contended that it would be error to admit text messages that favored the prosecution while excluding one that might help the defense, but he did not describe how the "all over me" text would have supported a theory of defense. (The defense he had offered to Investigator Joe was that the bedroom.)[2] The court excluded the text message

---

[2] On April 26, 2013, more than two weeks after the second hearing on the motion in limine, Defendant filed a motion for reconsideration of the court's order denying his motion to suppress. In that motion, Defendant for the first time argued that the "all over me" text was apparently exculpatory because it was an "adoption of statements [made by Mr. Sanisya] favorable to Mr. Harry." *United States v. Harry*, No. 1:10-cr-01915-JB, Doc. 138 at 3 (D.N.M. Apr. 26, 2013). This was insufficient to preserve the argument with respect to the government's motion in limine. It was made in support of a separate motion seeking to exclude, not admit, the text; and it was filed only two court days before the court issued its ruling on the Rule 412 motion. It is unlikely that the argument even

Continued . . .

and any testimony on Ms. Yazzie's flirtation from any witness other than Defendant. It permitted Defendant to testify to flirting based solely on the prosecution's concession at the hearing: "While the Court is not making an independent legal analysis whether it would allow [Defendant] to so testify, if the United States objected, the Court will hold the United States to its pretrial concession and allow [Defendant] to testify regarding [Ms. Yazzie's] behavior towards him, at the party, before the incident occurred." R., Doc. 191 at 32. The court also stated that it would reevaluate its ruling if Defendant sought reconsideration by presenting additional evidence. *See* R., Doc. 191 at 2 ("If [Defendant] discovers additional evidence which would render either [Ms. Yazzie's] touching, hugging, and/or sitting beside [Defendant], or her appearance partially undressed admissible, [Defendant] may notify the Court in accordance with [Rule] 412(c), and the Court will, at that time, evaluate [Defendant's] intended purpose for the evidence."). Defendant never reopened the issue.

At the jury trial in May 2013, Mr. Sanisya, Ms. Yazzie, Ms. Johnson, Ms. Murphy, and Investigator Joe were among the government witnesses. The government also introduced into evidence the text messages sent by Defendant to Mr. Sanisya, except for the "all over me" message. Defendant took the stand and testified briefly about his interactions with Ms. Yazzie during the party but did not state that she had flirted with

---

came to the attention of the court before ruling on the motion in limine; it did not resolve the motion for reconsideration until 18 months later.

him. Nor did he proffer to the district court any flirting testimony that he would have introduced but for the court's ruling excluding such testimony.

After Defendant's conviction the unchallenged presentence report calculated his federal guidelines sentencing range at 151to 188 months' imprisonment. The district court sentenced Defendant at the bottom of the range.

We now turn to Defendant's issues on appeal: that the district court erred by admitting Defendant's text messages, by excluding the "all over me" text, by prohibiting testimony about Ms. Yazzie's flirting from any witness other than Defendant, and by imposing a substantively unreasonable sentence.

## II.     FAILURE TO PRESERVE TEXT MESSAGES

Defendant complains that the government's failure to preserve the text messages sent by Mr. Sanisya deprived him of due process and that the proper remedy would have been to exclude his own messages from trial. We are not persuaded.

The Due Process Clause imposes duties on the government not to deprive a defendant of exculpatory evidence. *Brady v. Maryland*, 373 U.S. 83, 87 (1963), held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Here, Defendant made the requisite request, but the evidence was no longer available at that time. In that circumstance, the failure to preserve the evidence violates due process if the evidence was exculpatory and its exculpatory value was apparent before its loss (assuming that the

11

evidence was "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means"). *California v. Trombetta*, 467 U.S. 479, 489 (1984). If, however, the exculpatory evidence was not apparently exculpatory but merely "potentially useful," the failure to preserve the evidence does not violate due process "unless [the] criminal defendant can show bad faith on the part of the police." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). Of course, if we know now that the evidence was not exculpatory, there was no denial of due process. But if the police acted in bad faith, we start with the presumption that the evidence was exculpatory. *See id. But see United States v. Agurs*, 427 U.S. 97, 110 (1976) ("[I]f evidence actually has no probative significance at all, no purpose would be served by requiring a new trial simply because an inept prosecutor incorrectly believed he was suppressing a fact that would be vital to the defense. If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor.").

The district court denied Defendant's pretrial motion to suppress the texts, finding that any exculpatory value of Mr. Sanisya's outgoing texts was not apparent before their loss. It also found that Defendant failed to establish bad faith. We review both findings for clear error. *See United States v. Hargus*, 128 F.3d 1358, 1364 (10th Cir. 1997) (apparently exculpatory); *United States v. Richard*, 969 F.2d 849, 853 (10th Cir. 1992) (bad faith). We find no error in either finding.

12

## A. Exculpatory Nature

The government's duty to preserve extends only to evidence that "might be expected to play a significant role in the suspect's defense." *Trombetta*, 467 U.S. at 488. Defendant bears the burden of showing that the missing evidence met that standard when it was lost. *See United States v. Gomez*, 191 F.3d 1214, 1218 (10th Cir. 1999). In our view the district court did not clearly err in ruling that Defendant failed to satisfy his burden.

Defendant argues that at least one lost text would have been critical to his consent defense—the message from Mr. Sanisya to which Defendant replied, "I knw. She was all over me the whole nite." He contends that this reply must have been in response to a lost text from Mr. Sanisya stating that Ms. Yazzie had been flirting with Defendant.

But the "all over me" text falls short of making it "apparent" that the phone contained a separate, exculpatory message. To begin with, the meaning of Defendant's statement that "[s]he was all over me the whole nite" is not as clear as he now argues. In Defendant's reading of the text, the "she" is Ms. Yazzie and the text means that "she" was flirting all night. On that reading it would be logical to infer that the content of the lost text from Mr. Sanisya was as Defendant now proposes. But the "all over me" text need not be read in that way. For example, it is common to say that a critic of your actions is "all over" you. *See, e.g.*, *Martin v. Duncan Bit Servs. Inc.*, 2012 WL 3679537, at *3 n.9 (W.D. Okla. Aug. 24, 2012) ("I'm tired of you coming out here and jumping all over me, cursing."); *Johnson v. Westinghouse Elec. Corp.*, 752 F. Supp. 1000, 1004 (D.

13

Utah 1990) ("[H]e was really uptight because [people were] all over him, just really giving him a hard time."). And the "she" who was criticizing Defendant could have been someone other than Ms. Yazzie.

Moreover, we must view the message in light of what Investigator Joe knew when he saw it. In his interview with Joe, Defendant denied even entering the women's bedroom and did not give Joe any reason to believe that he had received an exculpatory text from Mr. Sanisya. Nor had Mr. Sanisya expressed any sympathy for Defendant during his interview. And Defendant's other messages were clearly incriminating. A good investigator will look for evidence both supporting and undercutting guilt. But the only apparent issue in the case was whether Defendant had engaged in sexual activity with Ms. Yazzie. If anything, evidence of her flirting with him made his guilt more likely, as perhaps providing a stimulus for his later drunken assault. The text message would not have appeared exculpatory.

In any event, we can assume that if Investigator Joe had actually seen a text message sent by Mr. Sanisya indicating that Ms. Yazzie had flirted with Defendant, its potential exculpatory value would have been apparent. But the record before us strongly suggests that no such text existed. Defendant's recorded statement to Investigator Joe in which he describes the text-message exchange gives no hint of any discussion of flirting. And Defendant never testified or otherwise stated that Ms. Yazzie had been flirting with him, even though the district court said it would permit such testimony at trial. When

14

asked at trial about his interactions with Ms. Yazzie that evening, he testified only as

follows:

> Q. Now, during the evening, did you and Alanna talk?
>
> A. We did chitchat for a bit.  You know, I said happy birthday to her. I gave her a friendly hug and we sat at the table.
>
> Q. And she hugged you back?
>
> A. Yeah.
>
> Q. And did you hug any other people that night or they hugged you?
>
> A. Oh, yeah. Steph, when I got there, you know, told her I was here, and then a couple of my friends, Ryan and Dimitri, a friendly gesture hug.

R., Doc. 251 at 45.  Further, at the suppression hearing Mr. Sanisya denied any

recollection of flirting:

> Q [Defense Counsel]. She was hitting on my client much of the evening, wasn't she?
>
> A. Define "hitting on."
>
> Q. I'm going to let you define it. She was getting flirty and affectionate with Myron?
>
> A. Not that I can recall.
>
> Q. Do you recall anything said or heard -- Was she sitting next to him much of the evening?
>
> A. Yes.
>
> Q. Do you recall if she was touching him or he was touching her?
>
> [Objection raised and denied.]
>
> A. Yes, it was just a hug.

15

R., Doc. 179 at 89.  He also testified that he did not recall "get[ting] any indication that [Ms. Yazzie] was sexually interested in [Defendant]."  *Id.* at 92.

The context of the text-message exchange also makes it highly unlikely that Mr. Sanisya said anything sympathetic to Defendant.  Defendant told investigators that the general thrust of Mr. Sanisya's messages was outrage, and he did not indicate that Mr. Sanisya had written anything favorable.  Defendant and Mr. Sanisya both testified at trial that Mr. Sanisya stated in the exchange that he no longer wished to be friends with Defendant.  Ms. Johnson, who watched Mr. Sanisya compose and send the messages, corroborated that his tone was not friendly.  One would doubt that Mr. Sanisya, amidst a sea of angry and accusatory texts—authored while his irate girlfriend, a longtime friend of Ms. Yazzie, was closely watching—also sent a text stating that Ms. Yazzie had been flirting with Defendant.

Of particular significance, the non-flirting meaning of the "all over me" message is now apparent from the evidence.  Defendant's testimony at trial suggests that the person who was "all over" him that night was his girlfriend, who had spent the evening at home with their infant child.  He testified about his decision to go home:

> At that time, around in the morning I was getting text messages from my fiancee at home and she was wondering where I was at and I should have been at home a long time ago, and I explained to her what was going on here and, you know, Dimitri was kind of getting out of hand, so she just told me, you know, "Stay there and just don't come back." So she was mad.

16

R., Doc. 251 at 52. His "all over me" text message seems likely to have been in response to a report from Mr. Sanisya concerning Defendant's girlfriend. Defendant told Investigator Joe that he sent his first text before he drove to his home ten miles away. After he got home, Ms. Johnson called the girlfriend, who came to the Johnson-Sanisya apartment ten minutes later and, upon hearing of the assault, began to cry. The "all over me" text would be a natural response if Mr. Sanisya had informed Defendant that Defendant's girlfriend was very upset with him. And Defendant sent the "all over me" text 53 minutes after his initial text, consistent with the time it would have taken for Defendant to drive home, his girlfriend to drive to the apartment, and Mr. Sanisya to inform Defendant that his girlfriend was very upset.

Therefore, even if, as the district court found, Investigator Joe saw the texts that Mr. Sanisya sent, Defendant would have to rely on "speculation and conjecture" to argue that Joe saw anything that looked exculpatory; that will not suffice. *United States v. Martinez,* 744 F.2d 76, 80 (10th Cir. 1984). In retrospect, we think it highly unlikely that the failure to save Mr. Sanisya's text messages deprived Defendant of any exculpatory evidence.[3]

---

[3] We note that Defendant also did not show that he "would be unable to obtain comparable evidence by other reasonably available means," such as examining his own phone. *Trombetta*, 467 U.S. at 489. But we do not rely on that lapse because the government did not argue the point in district court.

17

## B. Bad Faith

Because the missing texts were not apparently exculpatory, the government violated Defendant's right to due process only if it lost or deliberately destroyed the texts in bad faith. *See United States v. Bohl*, 25 F.3d 904, 909–10 (10th Cir. 1994). Although the district court found that the outgoing messages were still on Mr. Sanisya's phone when the government took possession of it, it also found that Defendant failed to establish bad-faith loss of the messages. We see no clear error in this finding.

Shortly after collecting Mr. Sanisya's phone, Investigator Joe attempted to recover the missing messages from the phone company; when that failed, he took the phone to the Farmington police department so that it could try to retrieve them. Importantly, he made these attempts before Defendant requested the missing messages. This timing counsels against a finding of bad faith. *Cf. Bohl*, 25 F.3d at 911–12 (bad faith suggested because the government destroyed physical evidence *after* Defendant requested the evidence and explained its potential exculpatory value).

Absence of an innocent explanation for the loss can also point to bad faith. *See Bohl*, 25 F.3d at 912. But here innocent destruction was possible. The cell-phone forensics examiner testified that he had previously encountered phones containing only one half of a conversation, that phones can automatically delete older messages if the memory is full, and that there was no evidence that anyone had intentionally deleted the lost messages from Mr. Sanisya's phone.

18

Finally, "[t]he mere fact that the government controlled the evidence and failed to preserve it is by itself insufficient to establish bad faith." *Richard*, 969 F.2d at 853–54. This proposition finds particular support in this case because Defendant acted just as the government did. He did not present as evidence Mr. Sanisya's text messages, which would have been on his phone as well. No one would ascribe Defendant's loss of the messages to his bad faith. We affirm the district court's ruling that the government did not violate Defendant's due-process rights.

## III. EXCLUSION OF EVIDENCE

### A. Text Message

The district court admitted into evidence most of Defendant's text messages but excluded, under Fed. R. Evid. 412 and as hearsay, the text reading "I knw. She was all over me the whole nite. I remember that." Rule 412 bars evidence "To prove that a victim engaged in other sexual behavior," *id.* (a)(1), or "to prove a victim's sexual predisposition," *id.* (a)(2). Viewing flirting evidence as suggesting only a predisposition toward casual sex, the court excluded the message under (a)(2). The court did not commit error.

To begin with, the text was hearsay, since it was an out-of-court statement offered "to prove the truth of the matter asserted in the statement"—that is, that Ms. Yazzie was

19

flirting. Fed. R. Evid. 801(c).[4] A statement by a party is not hearsay when offered by the opposing party, *see* Fed. R. Evid. 801(d)(2); so Defendant's texts could be offered by the prosecution. But none of his texts could be offered by him for their truth unless a hearsay exception applies. *See* Fed. R. Evid. 802.

The sole exception raised at the hearing on the motion in limine was the rule of completeness. That rule permits a party to demand, upon the introduction of a writing or recorded statement, the "introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." Fed. R. Evid. 106. This fairness principle can override the rule excluding hearsay. *See United States v. Lopez-Medina*, 596 F.3d 716, 735 (10th Cir. 2010) ("Even if the fact allocution would be subject to a hearsay objection, that does not block its use when it is needed to provide context for a statement already admitted.").

A defendant seeking reversal based on a violation of the rule of completeness faces a high bar. The contours of the fairness standard are "rather vague" and courts have "enormous discretion" in applying the rule. 1 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 106.02[1], at 106-4 to 106-6 (Mark S. Brodin, ed.,

---

[4] Defendant argues on appeal that he did not intend to offer the text to demonstrate Ms. Yazzie's actual behavior but rather to show that Defendant *believed* she was sexually interested in him. But he did not raise this argument in the district court and we decline to consider it here. *See United States v. Mora*, 293 F.3d 1213, 1216 (10th Cir. 2002) ("[W]e find no reason to deviate from the general rule that we do not address arguments presented for the first time on appeal.").

20

Matthew Bender 2d ed. 1997); *see Echo Acceptance Corp. v. Household Retail Servs., Inc.*, 267 F.3d 1068, 1088 (10th Cir. 2001) ("The trial court was familiar with the evidence in this case, and we decline to second-guess its judgment as to whether the excluded exhibits were necessary to provide context or completeness."); *United States v. Conley*, 186 F.3d 7, 22 (1st Cir. 1999) ("In making determinations as to the completeness of proffered statements, the district court's judgment is entitled to great respect."). At the least, the party invoking the rule must show that the proffered evidence is relevant. *See Lopez-Medina*, 596 F.3d at 735 ("[O]nly those portions which are relevant to an issue in the case . . . need to be admitted." (internal quotation marks omitted)); Fed. R. Evid. 402. Because Defendant did not explain in response to the government's motion in limine how the "all over me" text message was relevant, the district court did not abuse its discretion by declining to admit it.

"Evidence is relevant if:  (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. When the court ruled on the motion in limine, it was unclear how flirting evidence bore on any fact of consequence. At the pretrial suppression hearing, Investigator Joe had testified that Ms. Yazzie had alleged that she "awoke to someone having vaginal intercourse with her. Because she had consumed too much alcohol, she didn't realize what was going on." R., Doc. 179 at 25. At no time before the court's ruling did Defendant dispute that Ms. Yazzie had been asleep during the encounter. In his interview with Investigator Joe (recounted in relevant

part during the hearing on the government's motion in limine), Defendant had instead stated that he never entered the room where Ms. Yazzie was sleeping. Had he asserted this defense at trial, evidence of earlier flirting would not have helped him.

To be sure, after DNA test results showed that Defendant had intercourse with Ms. Yazzie, it appeared that the only viable defense would be consent. But defense counsel, perhaps for sound tactical reasons, did not suggest a scenario in which flirting would be relevant to the defense. And without knowing the contours of the defense, the possible relevance of flirting would not be apparent. The court was not required to speculate or to assume what a consent defense would look like. As the prosecution stated at the Rule 412 hearing, even if flirting had occurred it was not "an invitation. . . to have sex with her while she was passed out." R., Doc. 178 at 9. The court could well infer, and apparently did, that the only purpose for introducing the text would be to demean Ms. Yazzie by casting her as a flirt with a predisposition toward casual sex, a purpose that is not only irrelevant but specifically barred by Rule 412(a)(2). We see no abuse of discretion in the court's granting the motion in limine, particularly when the court invited Defendant to make a better showing later on.

Defendant had a much better relevance argument after he took the stand at trial. He testified that Ms. Yazzie was not asleep and in fact invited sexual contact when he approached her to say that he was leaving. He stated that he shook her and woke her up, at which point she "reached up and drew me closer," R., Doc. 251 at 54, that the two began kissing, and that Ms. Yazzie then reached to try to undo Defendant's belt buckle

22

and also removed her own underwear, *see id.* at 54–56. One could argue that evidence of flirting would make it more likely that Ms. Yazzie acted as Defendant described or that Defendant could reasonably interpret her actions in the bedroom as consent. *See Rodriguez-Hernandez v. Miranda-Velez*, 132 F.3d 848, 855–56 (1st Cir. 1998). (admitting "evidence concerning plaintiff's allegedly flirtatious behavior" toward defendant to show that defendant's sexual advances had not been unwanted.) But Defendant did not reopen the Rule 412 issue at trial. And the district court had no duty to reopen the matter on its own. *See Polys v. Trans-Colorado Airlines, Inc.*, 941 F.2d 1404, 1409 (10th Cir. 1991) ("The plaintiffs appear to believe that if the significance of excluded evidence becomes apparent later, a trial judge *sua sponte* must reconsider its earlier evidentiary ruling. The plaintiffs misunderstand the offer of proof requirement.");*cf. United States v. Parra*, 2 F.3d 1058, 1065 (10th Cir. 1993) ("[U]nless a party asks the district court to reconsider its decision at trial, we will not consider trial evidence which undermines a district court decision rendered at a pretrial suppression hearing." (citation omitted)).[5]

Exclusion of the "all over me" text message was not error.

---

[5] In addition, as discussed earlier, by the time of trial it would have been clearer that the "all over me" text had nothing to do with flirting.

### B. Other Flirting Evidence

The court also excluded testimony concerning whether Ms. Yazzie had flirted with Defendant on the night of the party, except that, in light of the prosecution's concession, it permitted Defendant to testify on the subject.

Defendant contends that this ruling was error that prejudiced his defense. He argues that because the "all over me" text indicates that Mr. Sanisya had observed Ms. Yazzie flirting with Defendant, he could have used that text message to cross-examine Mr. Sanisya, Ms. Johnson, and Ms. Murphy. As just discussed, however, Defendant did not explain at the hearing on the motion in limine how evidence of flirting was relevant to his defense. Moreover, Defendant cannot claim error in the exclusion of the evidence because he failed to make a proper proffer of the evidence that he asserts was excluded. *See* Fed. R. Evid. 103(a)(2) ("A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party and . . . if the ruling excludes evidence, a party informs the court of its substance by an offer of proof, unless the substance was apparent from the context.").

"[T]o qualify as an adequate offer of proof, the proponent must, first, describe the evidence and what it tends to show and, second, identify the grounds for admitting the evidence." *United States v. Adams*, 271 F.3d 1236, 1241 (10th Cir. 2001). A sufficiently detailed offer enables the court to make an informed ruling on admissibility and "provide[s] a record from which an appellate court can determine whether exclusion affected the substantial rights of the offering party." Wright & Graham, Federal Practice

and Procedure: Evidence 2d § 5040 (internal quotation marks omitted); *see Adams*, 271 F.3d at 1241 ("[A]n effective offer of proof creates a clear record that an appellate court can review to determine whether there was reversible error in excluding the testimony." (brackets and internal quotation marks omitted)).

Although an oral statement by counsel describing the evidence that he intends to admit can suffice as a proffer, *see Adams*, 271 F.3d at 1241, defense counsel's statements to the district court fell short. Asked by the court to identify evidence that might come in under Rule 412, counsel suggested that he might put on evidence of "something that occurred within the last eight hours before the incident" but stated that "at this point we haven't decided if we're going to try to put that portion of the evidence on." R., Doc. 178 at 4. When pressed by the court, Defendant declined to identify either the substance or the relevance of the potential testimony:

> COURT: All right. Let's talk a little bit about-- Let's talk about what you might try to glean from that party. What is it that you think you might want to put in from the party? That she was, for lack of a better word, coming on or was fli[r]ting with [Defendant]? Is that the kind of stuff?
>
> [Defense Counsel]: That's what the prosecution has suggested. And if that were the evidence, that would be part of the defense, and that's certainly -- I don't believe it falls under 412. We're not going to allege that they had sex earlier in the evening. But if that comes up, that is, I think --
>
> COURT: . . . How would that be relevant? . . . Let's say she flirted with him? How would that be relevant to the charges here?
>
> [Defense Counsel]: Judge, I can't speak more specifically to that without betraying possible defenses.

25

COURT: All right.

[Defense Counsel]: And I really don't feel I should say anything further until I hear what the prosecution presents at the trial. And that's something that --

COURT: You're saying I really -- you can't make a determination as to what 412 evidence you might have until you hear their case?

[Defense Counsel]: Yes. . . . That's my secondary point. My primary point is, I don't think anything -- that would be 412 even were there evidence brought in.

*Id.* at 4–5. This exchange contains no offer of proof. It does not tell us whether any witness would have testified that flirting occurred, much less enable us to determine whether the exclusion of such testimony affected Defendant's rights. *See New Mexico Sav. & Loan Ass'n v. U.S. Fid. & Guar. Co.*, 454 F.2d 328, 334 (10th Cir. 1972) ("Without an offer of proof we have no way of knowing whether [the excluded testimony] would have fulfilled [Defendant's] evident expectations as to what [the witnesses] would say.").

The court expressed its inclination to grant the government's motion but instructed defense counsel to bring a proper motion under Rule 412 if he wanted to offer any flirting evidence. It reiterated in its written order that it would reevaluate its ruling if Defendant presented additional evidence to support the admission of flirting testimony and filed the proper notice under Rule 412(c). Defendant, however, never tried to reopen the matter.

Because Defendant failed to make an adequate proffer, we can reverse only for plain error. *See Adams*, 271 F.3d at 1241; Fed. R. Evid. 103(e) ("A court may take notice of a plain error affecting a substantial right, even if the claim of error was not properly

26

preserved."). We will grant relief under the plain-error standard only if (1) the district court committed an error, (2) the error is clear at the time of the appeal, (3) the error "affects substantial rights," and (4) the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Frost*, 684 F.3d 963, 971 (10th Cir. 2012). An error affects substantial rights only "when it is prejudicial, meaning that there is a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." *United States v. Algarate-Valencia*, 550 F.3d 1238, 1242 (10th Cir. 2008) (internal quotation marks omitted).

But a lengthy analysis is generally unnecessary when an appellant challenging the exclusion of evidence failed to make an adequate offer of proof. As stated earlier, an offer is inadequate when it lacks the specificity necessary to determine whether the evidence would be admissible (so neither of the first two requirements of plain-error review is satisfied) or whether exclusion of the evidence prejudiced the appellant (so the third requirement is unsatisfied). *See Perkins v. Silver Mountain Sports Club & Spa, LLC*, 557 F.3d 1141, 1149 (10th Cir. 2009) ("[T]he district court did not err because it was never given the opportunity to evaluate the evidence [whose exclusion was challenged on appeal]."); *Polys*, 941 F.2d at 1410 ("[I]t is difficult to find plain error in cases like this because failure to comply with normal requirements of offers of proof is likely to produce a record which simply does not disclose the plain error." (bracket and internal quotation marks omitted)); Fed. R. Evid. 103(d) (now (e)) advisory committee's note to 1972 amendment ("In the nature of things the application of the plain error rule

27

will be more likely with respect to the admission of evidence than to exclusion, since failure to comply with normal requirements of offers of proof is likely to produce a record which simply does not disclose the error."). That is certainly the case here. To be sure, after the district court's ruling on the motion in limine there was evidence introduced at trial (Defendant's version of events) that might make flirting evidence relevant. But the absence of a proper proffer of flirting evidence still makes it impossible to determine whether the evidence would be admissible or whether its exclusion prejudiced Defendant. We therefore hold that Defendant is not entitled to relief under the plain-error doctrine.

On appeal Defendant argues that he did not testify at trial about flirting because he would have had no credibility unless the jury heard similar testimony from other witnesses, and, he says, he was barred from pursuing other witnesses on the matter. For example, he notes in his brief that he could have tried to refresh Mr. Sanisya's recollection by showing him the "all over me" message (and presumably asking what message he had sent to evoke that response from Defendant). We are quite skeptical that Defendant could have obtained any witnesses to testify about flirting. But in any event, offers of proof (of his own testimony and of corroborating witnesses) could have been made outside the presence of the jury, so he could have preserved his issue without risking any adverse reaction by the jury.

## IV.  SENTENCING

Defendant's guidelines sentencing range, which is not challenged on appeal, was

151 to 188 months' imprisonment.  The district court sentenced him to a term of 151

months.  He contends that his sentence was procedurally unreasonable because the

district court did not consider some of the sentencing factors set forth in 18 U.S.C.

§ 3553(a), *see United States v. Haley*, 529 F.3d 1308, 1311 (10th Cir. 2008) ("A sentence

is procedurally unreasonable if the district court . . . fails to consider the § 3553(a)

factors."), and was substantively unreasonable because it did not properly reflect those

relevant factors, *see United States v. Chavez*, 723 F.3d 1226, 1233 (10th Cir. 2013) ("In

considering whether a defendant's sentence is substantively reasonable, we examine

whether the length of the sentence is reasonable given all the circumstances of the case in

light of the factors set forth in 18 U.S.C. § 3553(a)." (internal quotation marks omitted)).

We review the reasonableness of a sentence for abuse of discretion.  *See id.*

Defendant's procedural-reasonableness argument is that the district court failed to

address "the aberrant nature of the commission of the offense, the kinds of sentence

options available, … the need to provide the defendant with other correctional treatment

in the most effective manner," and "his age and family circumstances."  Aplt. Br. at 46–

47.  But "[w]hen a district court imposes a within-Guidelines sentence, the court must

provide only a general statement of its reasons, and need not explicitly refer to either

the § 3553(a) factors or respond to every argument for leniency that it rejects in arriving

at a reasonable sentence."  *United States v. Lente*, 647 F.3d 1021, 1034 (10th Cir. 2011)

(internal quotation marks omitted).  And here the court comprehensively addressed

Defendant's request for a variance.  It stated that it considered supervised release and

29

acknowledged that certain factors, such as Defendant's education, skills, and lack of criminal history, supported a downward variance.  But it found that other factors, such as the seriousness of the offense and Defendant's lack of honesty, outweighed them.  We see no abuse of discretion in this case.

As for Defendant's substantive-reasonableness claim, a within-guidelines sentence is presumed reasonable and the defendant challenging the sentence has the burden of rebutting the presumption.  *See Chavez*, 723 F.3d at 1233.  In our view, Defendant did not satisfy his burden to rebut reasonableness.

## V.    CONCLUSION

We AFFIRM Defendant's conviction and sentence.