**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**March 31, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

BRANDON REDFOOT,

Defendant - Appellant.

No. 23-4148
(D.C. No. 2:18-CR-00527-CW-1)
(D. Utah)

_____

**ORDER AND JUDGMENT***
_____

Before **HARTZ**, **PHILLIPS**, and **FEDERICO**, Circuit Judges.
_____

In 2018, Defendant Brandon Redfoot fatally shot Julio Rodriguez. On August 18, 2023, a jury found Redfoot guilty of the following counts: Count One murder in the second degree while within Indian Country, in violation of 18 U.S.C. §§ 1111(a) and 1153(a); Count Two assault with a dangerous weapon while within Indian Country, in violation of 18 U.S.C. §§ 113(a)(3) and 1153(a); Count Three being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1); and Counts Four and Five discharge of a

---

* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A). He was sentenced to forty-five years of imprisonment.

On appeal, Redfoot argues that the district court made two plainly erroneous evidentiary rulings, which both individually and cumulatively require us to reverse his convictions on all counts except for Count Three. For Count Three, Redfoot argues that his felon in possession of a firearm conviction under 18 U.S.C. § 922(g)(1) violates the Second Amendment to the United States Constitution.

Exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742, we affirm.

## I. BACKGROUND

### A. Facts and Evidence

On June 7, 2018, Redfoot, Rachel Cornpeach, and three of their friends drove a white pickup truck to "the Merc," a grocery store in Randlett, Utah. At the same time, Tesha Gardner (Redfoot's ex-girlfriend and the mother of his son) was at the Merc with four friends of hers, one of whom was Rodriguez. Gardner's friends spotted Redfoot and his group and struck up a conversation. At some point, Rodriguez spoke to Redfoot and insulted Redfoot's son. After that, the two men got into a fistfight. The fight was broken up soon after it started, and both parties left in their respective trucks heading in opposite directions.

2

At this point, there are important discrepancies depending on who is telling the story. According to Cornpeach, she was driving the white truck, with Redfoot and three others inside. While she was driving, Redfoot pulled out his gun (a KelTec Sub2000 semi-automatic carbine with a folding stock) and told her to drive to Gardner's house. This gun had been purchased by Cornpeach, but it was used regularly by Redfoot. After Cornpeach refused to drive to Gardner's house, Redfoot threatened to shoot her and then fired a round from the gun into the truck's floor, which made her relent. Cornpeach then made a U-turn and began heading east towards Gardner's house. An impact hole was later found in the floor of the white truck, along with a bullet fragment.

In contrast, according to Redfoot and one of the other passengers, he never fired his gun inside the truck. Redfoot testified at trial that he was the one driving, and that he turned the truck around because he wanted to check on his son, who was in the custody of Gardner's mother but sometimes visited Gardner's house.

Cornpeach, Redfoot, and the three other passengers soon pulled up in front of Gardner's house. Rodriguez and another passenger who had been at the Merc were in Gardner's driveway in a red truck. Redfoot testified that he stepped out of the white truck, yelled at the people in the red truck, and then was suddenly fired upon. He then retrieved his gun from the white

3

truck and returned fire. Redfoot stated that he could feel multiple bullets going by him, so he emptied all the rounds of ammunition in the gun's magazine, before fleeing in the white truck.

But several witnesses testified that they saw Redfoot, and only Redfoot, fire at both Gardner's house and the red truck parked in the driveway, before he then fled the scene. Rodriguez was hit in the back of his head by a ricocheting bullet from Redfoot's gun. He was later pronounced dead at the hospital. Law enforcement found twenty-nine expended rounds from Redfoot's gun at the scene, with bullet impact holes in both Gardner's house and the red truck parked in the driveway. Only one round from another gun was found, an old, spent round that would have been fired well before this incident occurred.

Shortly after the shooting, Redfoot was arrested at a friend's house. After being arrested, he repeatedly made inculpatory statements, such as "it is all on me" and "I am the one that said go." R. III at 1118, 1212.

## B. Procedural History

Redfoot was charged by indictment with the five counts described above. Cornpeach was also charged with two counts of accessory after the fact in violation of 18 U.S.C. § 3, but she entered into a cooperation agreement with the Government.

4

A jury trial was held in August 2023. At trial, the Government sought to prove that Redfoot had intentionally fired upon Rodriguez and killed him with malice aforethought. Redfoot argued that he had acted in self-defense during the shooting. Redfoot admitted to possessing the gun at issue in violation of 18 U.S.C. § 922(g)(1), even as he contested all the other charges.

Two evidentiary rulings made at trial are relevant to this appeal. The first occurred during defense counsel's cross-examination of Cornpeach. Defense counsel asked, "[w]hen you had said that he had told you to turn around and go in that direction following the red truck, he told you he was concerned about his son Freddie, didn't he?" *Id.* at 389–90. The Government objected that this question called for hearsay. Defense counsel then argued that the question should come in under the rule of completeness, Federal Rule of Evidence 106, but the Government responded that this rule pertains only to documents. The district court sustained the objection, and defense counsel moved on to another question. Redfoot later testified that he had wanted to go to Gardner's house out of concern for his son, but that he did not say so aloud while in the truck.

The second evidentiary ruling, or more accurately the absence of a ruling, was the district court's decision to allow testimony about a previous incident involving Redfoot and his gun. On direct examination, the Government asked Gardner whether she had ever seen Redfoot with a gun,

and she said yes. When the Government asked her when she had seen Redfoot with a gun, she responded, "[w]hen he had pointed the gun at me." *Id.* at 414. She then described a gun identical to the one used in the shooting. When cross-examining Redfoot as to the ownership of the gun, the Government asked him: "[w]hat did you tell [Gardner] when you put [the gun] to her head?" *Id.* at 937. Redfoot responded, "I didn't tell her nothing. Nothing like that transpired." *Id.* At no point did defense counsel raise any objection to these questions.

Ultimately, the jury convicted Redfoot on all counts. The district court then imposed a forty-five-year term of imprisonment, followed by a five-year term of supervised release. This timely appeal followed.

## II.  DISCUSSION

### A.  Cornpeach's Testimony: Hearsay Objection

Redfoot argues that the district court erred when it prevented Cornpeach from testifying on cross-examination that Redfoot said he was concerned about his son. On appeal, Redfoot says that his statement as a declarant fell under Federal Rule of Evidence 803(3), which creates a hearsay exception for "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed[.]"

Where "a timely and proper objection" was not made before the district court, or where "the specific ground for reversal on an evidentiary ruling" on appeal does not match that argued at trial, plain error review applies. *United States v. Mendoza-Salgado*, 964 F.2d 993, 1008 (10th Cir. 1992) (citations omitted). Because defense counsel attempted to bring this question in under Federal Rule of Evidence 106 at trial, we review the district court's ruling for plain error.

We grant relief under plain error review "only when four requirements are met: (1) an error occurred; (2) the error is plain or obvious; (3) the error affects substantial rights; and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Lacy*, 904 F.3d 889, 893 (10th Cir. 2018) (citation omitted). "[T]he plain-error exception to the contemporaneous-objection rule is to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *Id.* (quoting *United States v. Young*, 470 U.S. 1, 15 (1985)).

We decide this appeal at the third prong of plain error review. Redfoot's plain error challenge fails because even assuming, without deciding, that Redfoot could demonstrate a plain error, any alleged error did not affect his substantial rights. "An error affects substantial rights only when it is prejudicial, meaning that there is a reasonable probability that,

7

but for the error claimed, the result of the proceeding would have been different." *United States v. Harry*, 816 F.3d 1268, 1283 (10th Cir. 2016) (internal citation and quotation marks omitted). And Redfoot "bears the burden to convince this [c]ourt, based on the record on appeal, that the error affected his substantial rights." *United States v. Gonzalez-Huerta*, 403 F.3d 727, 733 (10th Cir. 2005).

Redfoot has not met this burden. Any potential benefit to Redfoot from Cornpeach's hearsay testimony was sharply undermined by other evidence. Later in the trial, Redfoot testified that he wanted to go to Gardner's house out of concern for his son. But Redfoot stated on direct examination that he did *not* say this out loud. As such, under Redfoot's telling of events, Cornpeach necessarily would have stated that she did not hear Redfoot say he was concerned about his son. Alternatively, Cornpeach might have simply stated that she did not remember or was unaware of what Redfoot said, as she did in response to several other questions on cross examination.

In any event, the alleged error concerns only a minor point about Redfoot's motive for going to Gardner's house. The crux of the case was whether Redfoot fired his gun in self-defense once at the house, not why he went there. As such, the alleged error, if any, had a negligible impact on the outcome of Redfoot's trial, and Redfoot has not met his burden to show that the district court's decision affected his substantial rights.

## B. Gardner's Testimony

Redfoot also argues that the district court erred by not preventing the Government from eliciting testimony that Redfoot had pointed his gun at Gardner a week before the shooting. No objection to this evidence was raised at trial, so we are again reviewing for plain error. *See Mendoza-Salgado*, 964 F.2d at 1008.

Redfoot argues on appeal that Gardner's testimony should have been excluded under Federal Rule of Evidence 403, which states that a district court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of" unfair prejudice. To assess whether evidence was "properly admitted under Rule 403, we consider (1) whether the evidence was relevant, (2) whether it had the potential to unfairly prejudice the defendant, and (3) whether its probative value was substantially outweighed by the danger of unfair prejudice." *United States v. Cerno,* 529 F.3d 926, 933 (10th Cir. 2008). Redfoot argues that evidence of him pointing a gun at Gardner was unfairly prejudicial because its probative value in proving that he possessed the gun is outweighed by the fact that jurors

9

would construe it as improper character evidence of a propensity for violence.

We need not balance Redfoot's Rule 403 claim because, again, we can resolve this appeal at the third prong of plain error analysis.[1] Gardner's testimony that Redfoot had previously pointed his gun at her did not meaningfully undermine Redfoot's self-defense argument. That argument was based on Redfoot's claim that he was fired on first when he arrived at Gardner's house. But there was no evidence of another shooter. Redfoot fired twenty-nine rounds, and all the rounds found at the scene came from his gun, except for one that was too old to have been fired recently. Witness testimony, forensic evidence, and Redfoot's own inculpatory statements provided overwhelming evidence that he did not act in self-defense. In comparison with that evidence, Gardner's brief statement that Redfoot had previously pointed a gun at her was beside the point even if the jury used it

---

[1] Indeed, it is difficult to properly analyze any Rule 403 claim for plain error. On appellate review, we grant trial courts "considerable discretion" in making Rule 403 decisions since they conduct the trial and can better balance the evidence at issue. *United States v. Watson*, 766 F.3d 1219, 1241 (10th Cir. 2014) (quoting *United States v. MacKay*, 715 F.3d 807, 839 (10th Cir. 2013)). "We have declined to find plain error in the admission of evidence under Rule 403 even when we disagree with the court's balancing." *United States v. Herrera*, 51 F.4th 1226, 1255 (10th Cir. 2022) (citing *United States v. Ibarra-Diaz*, 805 F.3d 908, 929 (10th Cir. 2015)). This case does not present an occasion to make the extraordinary finding of plain error on Rule 403 grounds.

to infer that Redfoot had a violent character. Given the weight of the evidence, the alleged error did not affect Redfoot's substantial rights.

## C.  Cumulative Error

Redfoot further argues that, even if each of these alleged errors does not warrant reversal on its own, their cumulative impact affected his substantial rights. In a cumulative error analysis, we aggregate all the errors that individually have been found to not warrant reversal, and then analyze whether their cumulative effect on the outcome of the trial is such that they collectively warrant reversal. *See United States v. Starks*, 34 F.4th 1142, 1169 (10th Cir. 2022).

Here, the alleged errors are cumulatively harmless for much the same reason that they are individually harmless. The key question for the jury was whether Redfoot was acting in self-defense when he shot Rodriguez. Neither of the alleged errors relate to the core issue of self-defense, so their cumulative impact is no greater than their individual impact.

Ultimately, aside from his own testimony, there is little evidence that Redfoot was acting in self-defense. In contrast, the Government presented extensive evidence demonstrating that Redfoot was the first and only shooter. Even if the jury had heard from Cornpeach that Redfoot was concerned about his son and had not heard from Gardner that he had previously pointed a gun at her, there is not "a reasonable probability that

11

. . . the result of the proceeding would have been different." *Harry*, 816 F.3d at 1283 (citation omitted). Under these circumstances, we do not reverse for cumulative error.

## D.  Second Amendment Claim

Finally, Redfoot argues for preservation purposes that his conviction under 18 U.S.C. § 922(g)(1) must be vacated because it violates the Second Amendment, citing *New York State Rifle & Pistol Ass'n v. Bruen*. 597 U.S. 1 (2022). This argument is now foreclosed by Tenth Circuit precedent, as we recently reaffirmed that § 922(g)(1) remains good law. *See Vincent v. Bondi*, 127 F.4th 1263, 1265 (10th Cir. 2025). As such, we do not reverse his conviction under Count Three.

## III.  CONCLUSION

Accordingly, we **AFFIRM** Redfoot's convictions and sentence.

Entered for the Court


Richard E.N. Federico
Circuit Judge