FILED
United States Court of Appeals
Tenth Circuit

October 20, 2017

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

KATHLEEN STEGMAN,

     Defendant - Appellant.

No. 16-3321

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 2:14-CR-20109-JAR-1)**

---

Justin K. Gelfand, Capes Sokol Goodman & Sarachan, P.C., St. Louis, Missouri, appearing for Appellant.

Jeffrey Brian Bender, Attorney, Tax Division (David A. Hubbert, Acting Assistant Attorney General, S. Robert Lyons, Chief, Criminal Appeals & Tax Enforcement Policy Section, and Gregory Victor Davis, Attorney, Tax Division, with him on the brief), United States Department of Justice, Washington, D.C., appearing for Appellee.

---

Before **BRISCOE**, **EBEL**, and **MATHESON**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

Defendant Kathleen Stegman was convicted by a jury of two counts of evading her personal taxes for the tax years 2007 and 2008, in violation of 26 U.S.C. § 7201. Stegman was sentenced to a term of imprisonment of 51 months, to be followed by a three-year term of supervised release. The district court also ordered Stegman to pay a $100,000 fine, plus restitution in the amount of $68,733. Stegman now appeals. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm Stegman's convictions and sentence.

I

*Factual background*

In September 1997, Stegman formed a Kansas corporation called Midwest Medical Aesthetics Center, Inc. (MMACI). The company operated in an office in Leawood, Kansas, and provided a wide range of medical aesthetic services including, but not limited to, liposuction, microdermabrasion, and laser hair removal.

On January 16, 1998, a Certificate of Amendment was filed with the Kansas Secretary of State to reflect a name change from MMACI to Midwest Medical Aesthetics Center, P.A. (MMACPA or Midwest), and, relatedly, to convert the business to a professional association. Notwithstanding the name change, the business continued to be owned and operated by Stegman, and also continued to provide the same types of medical aesthetic services.

2

Clients of Midwest were permitted to pay for services with a credit card, cash, or checks made out to Stegman personally. Of these forms of payment, Stegman preferred and encouraged the use of cash or checks. At the end of each business day, Stegman would personally collect the cash and checks that were paid by Midwest's clients.

Stegman established several limited liability corporations, including Samson, LLC (Samson). Stegman in turn used these corporations to effectively launder Midwest client payments. As part of this process, Stegman would use the corporations to purchase money orders, typically in denominations of $500 or less, that she in turn used to purchase items for personal use. In 2007, Stegman purchased 162 money orders totaling $77,181.92. In 2008, she purchased 252 money orders totaling $121,869.99. And in 2009, she purchased 157 money orders totaling $73,697.31. Notably, Stegman reported zero cash income on her federal income tax returns during each of these years.

Stegman employed separate tax preparers for her corporate and personal tax returns. Alex Jones prepared the corporate tax returns. Don Lake prepared Stegman's personal tax returns. Although Stegman provided Jones with Midwest bank account information as proof of its corporate income, she did not provide him with bank records for the other accounts into which she deposited corporate income, including the Samson account and a personal account at U.S. Bank. Similarly, Stegman did not provide Lake with accurate records of the Midwest

client payments that she used to purchase personal property.

In November 2009, the Internal Revenue Service (IRS) initiated a civil audit of the 2007 and 2008 tax returns of both Stegman and Midwest. During the civil audit, Stegman told the IRS that Midwest never accepted cash payments and rarely accepted checks. Stegman further told the IRS that she kept approximately $300,000 in cash at her home and reported that the source of the cash was gifts from relatives or money that she had saved from prior earnings. Stegman also provided the IRS with conflicting information about Samson and its purpose. Initially, Stegman told the IRS that "the business purpose of Samson was to lease equipment to Midwest . . . , and she paid them approximately $3,000 a month." Aplee. App. at 115. She later told the IRS that "Samson had no business purpose" and "was only the name of a bank account." Id. at 116.

In October 2010, the case was referred to the IRS's criminal investigation division. The criminal referral report listed the basis for suspected fraud as omitted income and false expenses/deductions. The report noted that Midwest took in large amounts of cash, yet made no cash deposits in 2007 or 2008. The report also noted Stegman's "lavish" lifestyle, which included frequent travel, large asset purchases of approximately $2,000,000 (unsupported by associated loans), all despite her reporting personal income of $50,000 for 2007 and $57,105 in 2008. Notably, the report indicated that, contrary to her 2007 and 2008 tax returns, Stegman had submitted loan applications reporting personal income

4

ranging from $10,000 to $46,000 per month.

For example, in 2007, Stegman applied for loans related to the purchase of two condominium units in Las Vegas. On her loan applications, Stegman represented that her monthly income was $30,000, even though her 2007 federal tax return reported an annual adjusted gross income of $79,428. Stegman purchased the condominium units for $543,966.16 and $558,652.86. In 2009, however, she disposed of both units by way of short sale contracts, resulting in forgiven debt of $362,209 and $339,722. In doing so, Stegman falsely reported to the lending bank that she was broke.

As part of its criminal investigation, the IRS interviewed Midwest employees and clients, reviewed bank records, money order purchases, business and bank records, and tax records. The investigation revealed that Stegman used Samson to create false business expenses. For example, Stegman falsely claimed that Samson provided "cleaning," "maintenance," "equipment," and "supplies" to Midwest.

The investigation also revealed that Stegman engaged in obstructive conduct. In particular, she altered Midwest's general ledgers and directed employees of Midwest to destroy business records, including payment receipts, client folders, and a sign that was used at the business stating that cash was accepted. Stegman also altered business ledgers that she provided to the IRS; the IRS was able, however, to obtain the original, unaltered ledgers from her tax

5

preparer. Lastly, Stegman encouraged a former Midwest client, Dr. Evelyn Clark, to tell the IRS that she didn't remember anything about her dealings with Midwest.

*Procedural background*

On October 29, 2014, a federal grand jury indicted Stegman on five counts (Counts 1 through 5) of tax evasion, covering the tax years 2007 through 2010, in violation of 26 U.S.C. § 7201, and one count (Count 6) of conspiring to defraud the United States by obstructing the lawful governing functions of the IRS, in violation of 18 U.S.C. § 371.[1] Each of the five counts of tax evasion were tied to a specific tax year. Counts 1 through 3 related to the tax years 2008 through 2010 for the business. Counts 4 and 5 related to the tax years 2007 and 2008 for Stegman personally. The conspiracy count (Count 6) charged both Stegman and an individual named Christopher Smith with conspiring to defraud the United States by obstructing the IRS from ascertaining, computing, assessing and collecting federal corporate and personal taxes.

On February 24, 2015, Stegman moved "to dismiss th[e] case due to the Government's destruction of exculpatory evidence," namely, "the IRS audit file regarding . . . Stegman's 2000 and 2001 federal tax returns." Aplt. App., Vol. 1 at 95. The district court denied that motion.

---

[1] A superseding indictment was filed on January 21, 2015. The superseding indictment did not add or remove any counts that were contained in the original indictment.

The case proceeded to trial beginning on March 8, 2016. During the first week of trial, the district court granted the government's motion to amend the indictment to change all of the references to "Midwest Medical Aesthetics Center, Inc." to instead read "Midwest Medical Aesthetics Center." At the conclusion of the evidence, the jury convicted Stegman of evading her personal taxes for the tax years 2007 and 2008 (Counts 4 and 5), as well as evading corporate taxes for the tax years 2008 and 2009 (Counts 1 and 2). The jury acquitted Stegman of evading corporate taxes for the tax year 2010 (Count 3). The jury also acquitted Stegman and Smith of the conspiracy charge (Count 6).

Stegman moved for judgment of acquittal or, in the alternative, a new trial. The district court granted the motion as to the two counts that related to the evasion of corporate taxes (Counts 1 and 2), but denied the remainder of the motion. In doing so, the district court concluded that "there was a flaw in the way the case was charged." Aplt. App., Vol. XII at 3311. In other words, the district court explained, it chose to acquit Stegman of the corporate tax evasion counts not due to a lack of "proof beyond a reasonable doubt that this corporation evaded taxes," but rather because "the indictment itself was flawed in attributing the loss as due and owing by Ms. Stegman, when actually it was due and owing by the corporation." Id. at 3314.

The district court sentenced Stegman on October 18, 2016. Based upon testimony from IRS Revenue Agent Janice Willard, the district court found that

7

Stegman's evasion of personal and corporate taxes caused a federal tax loss in excess of $550,000. The district court also imposed enhancements for use of sophisticated means and obstruction of justice. The district court ultimately sentenced Stegman to a term of imprisonment of 51 months, a sentence at the low end of the advisory Guidelines range, to be followed by a three-year term of supervised release. The district court also ordered Stegman to pay a $100,000 fine, plus restitution to the IRS in the amount of $68,733.

II

Stegman raises five issues on appeal, four of which pertain to her convictions and one of which pertains to her sentence. Although several of these issues require extensive discussion due to their fact-intensive nature, we conclude that all of these issues lack merit.

### A. *The amendment of the indictment during trial*

In her first issue on appeal, Stegman contends that the district court erred by granting the government's motion to amend the indictment in the midst of trial. We review de novo a district court's decision to grant or deny a motion to amend an indictment. See United States v. Pina, 974 F.2d 1241, 1243 (10th Cir. 1992).

### 1. Relevant facts

In 1997, Stegman filed articles of incorporation with the State of Kansas for MMACI. The following year, 1998, Stegman filed an amendment to the

8

articles of incorporation that converted the business to a professional association and altered slightly its name (MMACPA).

Stegman's filings with the IRS, however, did not make the nature or name of her business clear. During the time period covered by the superseding indictment, the tax returns that Stegman filed with the IRS identified the business as "Midwest Medical Aesthetics Center," but did not otherwise identify Midwest's particular corporate form. Further, the forms effectively treated the business as a C corporation. Not until February 2013 did Stegman file documents with the IRS adding a "P.A." to the name of her business.

The indictment in this case alleged that Stegman "was the owner/operator of Midwest Medical Aesthetics Center, Inc. (MMACI), located in Leawood, Kansas." Dist. Ct. Docket No. 1 at 1. The indictment proceeded to refer repeatedly to MMACI. A superseding indictment was returned in January 2015 that included the same references to MMACI.

During opening statements at trial, defense counsel mentioned that the entity at issue was "more properly called Midwest Medical Aesthetics Center, P.A. for professional association." Aplt. App., Vol. VIII at 2251. Subsequently, "in the course of cross examining more than several [government] witnesses," defense counsel raised the issue "again as to the proper name [of the entity] and, beyond that even, the existence of the entity Midwest Medical Aesthetics Center, Inc." Id. The government objected, and the district court heard arguments and

9

invited briefing on the issue. The government, as part of its briefing on the issue, moved to amend the superseding indictment to read "Midwest Medical Aesthetics Center and not Midwest Medical Aesthetics Center, Inc." Aplt. App., Vol. II at 444.

On the sixth day of trial[2], the district court granted the government's motion to amend and ordered that the superseding indictment refer to Stegman's business as "Midwest Medical Aesthetics Center." Id., Vol. VIII at 2258-59. In doing so, the district court concluded that Stegman was "fully on notice of which entity [wa]s at issue" in the indictment. Id. at 2254. The district court explained:

> This isn't a situation where there actually is a Midwest Medical Aesthetics Center, Inc., that filed a different set of tax forms. This isn't a situation where there could potentially be a jeopardy, double jeopardy problem because there's an entity that filed tax returns under this name, but the government has charged an entity under another name. All were on notice that it was Midwest Medical Aesthetics Center that was the subject of Counts 2, 3, and 4.
> And therefore, I find that it is a minor change and a variance. It doesn't prejudice the defendants. The defendants were on notice. And that in all respects, this is a variance that can be amended, as the government moves to amend, by going forward with the name being Midwest Medical Aesthetics Center. That matches the name on the tax returns. It matches the name on most of the business records that I've seen thus far. * * *
> A variance, as opposed to an amendment, occurs when the evidence at trial proves facts other than those alleged in the indictment, but the charging terms and elements stated in the indictment remain unaltered. And that is the case here.

_____

[2] The first day of trial was comprised solely of voir dire. Testimony began on the second day of trial, following the parties' opening statements. The presentation of testimony from both sides occurred over a period of approximately twenty days.

10

This is the type of variance that does not affect the substantial rights of the defendants in this case because the variance does not prevent the defendants from presenting their defense properly, it does not unfairly surprise them, or surprise them at all. It does not expose them to double jeopardy.

This variance is not fatal because the defendants, again, could've anticipated from the indictment and the evidence what evidence would be presented at trial. Could've anticipated just from the face of the indictment itself what evidence would be presented at trial, again, the corporate tax returns for this entity.

Id. at 2254-2256.

At the conclusion of all the evidence, the jury found Stegman guilty of two counts of corporate tax evasion and two counts of personal tax evasion, and acquitted her on one count of corporate tax evasion and the conspiracy charge. Stegman subsequently moved for judgment of acquittal, and the district court granted her motion in part, dismissing the two convictions for corporate tax evasion. In doing so, the district court noted, as argued by Stegman, that "the Superseding Indictment specifie[d] that the corporate taxes were due and owing by Stegman, and the Government did not prove that Stegman herself owed the taxes." Id., Vol. VI at 1740. More specifically, the district court noted that the government "did not offer evidence that would have supported a theory that [Midwest] was a sham corporation or a disregarded entity, nor did it attempt to pierce [Midwest]'s corporate veil." Id. at 1740-1741. Thus, the district court concluded, "the income tax at issue . . . was due and owing by [Midwest], not Ms. Stegman." Id. at 1741.

11

*2. Analysis*

The Presentment Clause of the Fifth Amendment states, in pertinent part, that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend. V. The Supreme Court has interpreted this provision to mean that an indictment may not be "amended except by resubmission to the grand jury." Russell v. United States, 369 U.S. 749, 770 (1962); see also Stirone v. United States, 361 U.S. 212, 215-16 (1960).

This prohibition does not, however, "extend to alterations that are 'merely a matter of form.'" United States v. Dowdell, 595 F.3d 50, 67 (1st Cir. 2010) (quoting Russell, 369 U.S. at 770). Thus, we "ha[ve] distinguished between a district court's amending an indictment as to form, which is permissible, and as to substance, which is an impermissible usurpation of the grand jury's prerogative." United States v. Pina, 974 F.2d 1241, 1243 (10th Cir. 1992). Further, we have "defined an amendment of form as a change that does not mislead the defendant in any sense, does not subject the defendant to any added burdens, and does not otherwise prejudice the defendant." Id. Likewise, other circuits "have allowed ministerial corrections of clerical errors in names, dates, and citations, so long as the change would not deprive the defendant of notice of the charges against him." Dowdell, 595 F.3d at 68. "In short, when a change 'le[aves] the substance of the charge unaffected, the switch d[oes] not usurp the prerogative of the grand jury."

12

Id. (quoting United States v. Eirby, 262 F.3d 31, 38 (1st Cir. 2001)) (alteration in original).

Stegman argues that "[t]he amendment substantively changed the entity from which individual and corporate income tax obligations allegedly flowed and the affirmative acts of tax evasion the Government had to prove." Aplt. Br. at 13. "Furthermore," she argues, "the district court constructively amended the indictment by, *inter alia*, broadening the possible bases for conviction." Id. Stegman argues that "[t]o allow an indictment to be amended in a tax evasion case to substitute the name of one business entity allegedly impacting tax liability for the name of another business entity frustrates 130 years of jurisprudence prohibiting district courts from amending indictments." Id.

We reject these arguments. Contrary to her assertion, and consistent with what the district court concluded, the amendment was merely a matter of form, dropping the "Inc." to accurately reflect the change that Stegman made to the structure of her business (and a change, we note, that she did not alert the IRS to when she filed the business's federal tax returns). Further, as clearly stated by the district court, the amendment did not mislead Stegman in any sense, did not subject her to any added burdens, and did not otherwise prejudice her in any way. See Pina, 974 F.2d at 1243. Moreover, the amendment did not deprive Stegman of notice of the charges against her. In short, the obvious and consistent focus of the criminal proceedings, both before and after the amendment, was on whether

13

Stegman evaded federal taxes by diverting money from the only business she owned that generated an income, using that money for personal expenses, and failing to properly report these transactions to the IRS. Consequently, because the amendment was one of form only, the district court did not err in granting the government's motion to amend the indictment.

Stegman also asserts that the district court's allowance of the amendment violated her due process rights. Specifically, she argues that "[t]he jury was never told there was an amendment or that [she] was entitled to rely on the indictment" and, "[a]s a result, the jury may have been left with the impression that [she] misled them on the issue of the existence of MMACI." Aplt. Br. at 29.

This argument fails for several reasons. First, Stegman's counsel conceded at oral argument that Stegman never asked the district court for such an instruction. Second, and relatedly, she failed to properly alert the district court to this constitutional challenge. Third, the argument lacks merit given our conclusion that the amendment was one of form only. Finally, the evidence of Stegman's guilt was overwhelming and thus we are not persuaded that the district court's decision to allow the amendment deprived her of the right to a fair trial.

*B. The purported Braswell violation*

In her second issue on appeal, Stegman contends that the government violated the Supreme Court's decision in Braswell v. United States, 487 U.S. 99 (1988), by using against her corporate records, specifically company ledgers, that

14

it obtained by compulsory summons issued to her, and that this violation requires reversal of her convictions. Because this issue concerns Stegman's Fifth Amendment privilege against self-incrimination, we review the issue de novo. See United States v. Banks, 761 F.3d 1163, 1184 (10th Cir. 2014) ("Whether a defendant's Fifth Amendment privilege against self-incrimination has been violated is a legal question we review de novo.").

### 1. The holding in Braswell

The Supreme Court granted certiorari in Braswell to address "the question whether the custodian of corporate records may resist a subpoena for such records on the ground that the act of production would incriminate him in violation of the Fifth Amendment." 487 U.S. at 100. The Supreme Court "conclude[d] that he may not." Id. In reaching this conclusion, the Court began by noting that corporations "are not protected by the Fifth Amendment." Id. at 102. More specifically, the Court noted that it "ha[d] long recognized that, for purposes of the Fifth Amendment, corporations and other collective entities are treated differently from individuals." Id. at 104. This collective entity rule, the Court noted, mandated "that without regard to whether [a] subpoena is addressed to the corporation" or "to the individual in his capacity as a custodian, a corporate custodian . . . may not resist a subpoena for corporate records on Fifth Amendment grounds." Id. at 108-09 (citations omitted). The Court then contrasted this with sole proprietorships and noted that sole proprietors are

15

entitled to "show that [an] act of production [of proprietorship documents] would

entail testimonial self-incrimination." Id. at 104.

In a passage relevant to the case at hand, the Court explained the proper

and improper uses of corporate records produced pursuant to a subpoena:

> Although a corporate custodian is not entitled to resist a subpoena on
> the ground that his act of production will be personally
> incriminating, we do think certain consequences flow from the fact
> that the custodian's act of production is one in his representative
> rather than personal capacity.  Because the custodian acts as a
> representative, the act is deemed one of the corporation and not the
> individual.  Therefore, the Government concedes, as it must, that it
> may make no evidentiary use of the "individual act" against the
> individual.  For example, in a criminal prosecution against the
> custodian, the Government may not introduce into evidence before
> the jury the fact that the subpoena was served upon and the
> corporation's documents were delivered by one particular individual,
> the custodian.  The Government has the right, however, to use the
> corporation's act of production against the custodian.  The
> Government may offer testimony—for example, from the process
> server who delivered the subpoena and from the individual who
> received the records—establishing that the corporation produced the
> records subpoenaed.  The jury may draw from the corporation's act
> of production the conclusion that the records in question are
> authentic corporate records, which the corporation possessed, and
> which it produced in response to the subpoena.  And if the defendant
> held a prominent position within the corporation that produced the
> records, the jury may, just as it would had someone else produced the
> documents, reasonably infer that he had possession of the documents
> or knowledge of their contents.  Because the jury is not told that the
> defendant produced the records, any nexus between the defendant
> and the documents results solely from the corporation's act of
> production and other evidence in the case.

Id. at 117-18 (footnote omitted).

16

*2. Relevant facts*

Prior to trial, Stegman moved "to exclude from evidence handwritten ledgers of Midwest . . . , which were produced to the IRS pursuant to a Corporate Summons." Dist. Ct. Docket No. 146 at 7. Stegman argued, in pertinent part, that under Braswell, "the Government [could not] introduce into evidence the fact that . . . Stegman produced the documents in response to [a] subpoena, and thus [could not] attribute the documents to Stegman as an individual." Id. The district court denied Stegman's motion. In doing so, the district court concluded that "the ledgers [we]re admissible as business records without compelling . . . Stegman to testify." Id. The district court emphasized that "[t]he Government's witnesses would not be permitted to name . . . Stegman as the custodian of records or the person who received the subpoena." Id. at 7-8.

During its case in chief, the government presented testimony from IRS Agent Janice Willard. She testified that the IRS, during its criminal investigation, served a summons on Midwest and obtained ledgers in response to the summons. Defense counsel, citing Braswell, objected to the ledgers being "attributed to Ms. Stegman by her handwriting." Aplt. App. at 2717 (Trial Tr. at 3904). The district court overruled the objection, consistent with its pretrial ruling on Stegman's motion to exclude the evidence.

Later, during the cross-examination of Stegman's expert witness, government counsel asked about those ledgers:

Q. Whose ledgers are these?

A. I'm assuming they're Ms. Stegman's.

Q. So you're testifying in a criminal tax case based on ledgers that are squarely at issue, and you're assuming that those are Ms. Stegman's?

A. Well, you're assuming. That's the testimony you're giving. You're saying that she faxed those or she provided those. I'm not sure about - - is that 2010?

Q. Did you hear testimony from Revenue Agent Willard that in response to a summons, she received these green ledgers; yes or no?

A. I don't know what years those are.

Q. So you don't know when these ledgers were received by the IRS; is that what you're saying to the jury now?

A. I can't tell you - - if you'd let me see the ledgers, I could tell you. I know that there - - there were ledgers provided. I don't know who you got them from at this point.

Q. Well, have you - - let me ask you, did you listen to Revenue Agent Willard testify that she received green ledgers, and that was introduced as evidence in this trial you were part of?

A. These are green ledgers that she received; is that what you're saying? In 2010, okay, right.

Q. Okay. Do you recognize those ledgers?

A. I do.

Q. And can you finally agree with us that those are Ms. Stegman's ledgers that she controlled; yes or no?

Aplt. App. at 3063-64 (Trial Tr. at 4547-48).

Before Stegman's expert witness responded to this last question, Stegman's

18

counsel asked to approach the bench.  The district court responded in the

following manner, carefully noting the parameters of the holding in Braswell:

> There's no *Braswell* violation.  This is a - - basically, it's a closely-held corporation, almost a single shareholder, depending on what you look at in those years.  The testimony has been that these were produced pursuant to a summons, not who produced them, but produced pursuant to a summons, received by the revenue agent.  And there has obviously been testimony that these were ledgers prepared by Ms. Stegman.  All of that taken together in context does not make that a *Braswell* violation.
>
> I was concerned during his examination of this witness that he was going to say something inappropriate in the context of him not wanting to answer questions.  So you might want to remind him about that rule because I don't typically want anybody testifying that Ms. Stegman produced these in response to a summons.

Id. at 3064-65 (Trial Tr. at 4548-49).

*3. Analysis*

Stegman argues on appeal that "[t]he prosecutor . . . violated Braswell by

asking [the] witness to agree 'that those are Ms. Stegman's ledgers that she

controlled.'"  Aplt. Br. at 14 (quoting Aplt. App. at 3062-64).  In other words,

Stegman argues, "[t]he prosecutor blatantly attributed the records to [her], not the

*corporation*."  Id. at 33 (emphasis in original).  Stegman in turn argues that

"[b]ecause *inter alia* the Government used these ledgers to advance its allegation

that [she] used whiteout before disclosing documents to the IRS, the Government

cannot prove that this was harmless beyond a reasonable doubt."  Id. at 14.

19

Contrary to Stegman's assertions, however, we conclude that the prosecutor's questions did not violate Braswell. Specifically, the prosecutor did not ask the witness whether Stegman was the one who the compulsory summons was served upon or the one who delivered the requested ledgers to the government. Rather, the prosecutor asked the witness only who owned or controlled the ledgers and the witness testified simply that he assumed the ledgers belonged to Stegman. Thus, the questions did not violate the prohibition outlined in Braswell. It is also worth noting, as the district court did in overruling Stegman's contemporaneous objection, that nothing about the questions or the response was particularly significant, given the other evidence that was presented at trial establishing that Stegman was in complete control of Midwest and had prepared the ledgers at issue.

In sum, then, we conclude that the prosecutor's questions and the witness's response did not violate Stegman's Fifth Amendment privilege against self-incrimination.

### C. The alleged destruction of exculpatory evidence

In her third issue on appeal, Stegman argues that the district court erred in denying her motion to dismiss the indictment due to destruction of exculpatory evidence. As explained in more detail below, the district court denied the motion based upon a series of factual findings made after conducting an evidentiary hearing on the motion. We review the district court's factual findings for clear

20

error.  United States v. Harry, 816 F.3d 1268, 1276 (10th Cir. 2016).

### 1. Relevant facts

In 2004 and 2005, the IRS audited Stegman's personal tax returns for the years 2000 and 2001.  The IRS did so because of Stegman's involvement in, and victimization by, an offshore investment "Ponzi scheme" called Anderson Ark Associates.  This audit ultimately resulted in a "no change" letter issued by the IRS to Stegman.

In November 2009, the IRS initiated a civil audit of the 2007 and 2008 tax returns of both Stegman and Midwest.  In October 2010, the case was referred to the IRS's criminal investigation division.  As part of the referral, the IRS's civil division forwarded to the criminal division a "referral package" of documents that included the file from the earlier audit that the IRS had conducted regarding Stegman's 2000 and 2001 tax returns.  That file "consisted of a stack of paper that was approximately six to seven inches thick."  Dist. Ct. Docket No. 108 at 4.

On April 6 and 11, 2011, IRS agent Willard spent approximately twelve hours reviewing the file relating to the 2000 and 2001 audit.  Willard "took fourteen pages of notes" during this review.  Id.  According to Willard, "she reviewed the file to see if there were similar issues involved as with her investigation, to see if [Stegman] or her tax preparer made a statement in the prior audit, and to see if there was a pattern of conduct."  Id.  Further, Willard indicated that "[h]er notes were intended to serve as a manageable summary of

21

the documents included in the file." Id. Willard provided her notes to her supervisor, Special Agent Randy Praiswater, "and they discussed the file" and "agreed the civil audit [in 2000 and 2001] dealt with the Anderson Ark scheme because Stegman was considered a victim of that Ponzi scheme." Id. at 5. Although "[t]hey noted that there were some similar transactions included in the civil audit file related to the current investigation," they likewise noted that "the civil audit file involved conduct that was close to ten years old" and "[t]hey did not believe those transactions were relevant to the tax years that were the subject of the criminal investigation." Id.

Willard and Praiswater did not discuss the 2000 and 2001 audit file again until February 2013, when they agreed that the file should be sent back to the IRS's civil division for refiling because it was not relevant to the criminal investigation. According to Praiswater, he and Willard "examined the file for potential defenses, or for items that were similar to the activity . . . under investigation, and determined that the civil audit file was not relevant to the . . . criminal case." Id. at 5-6. Consequently, "[o]n March 1, 2013, . . . Willard returned the civil audit file to her supervisor . . . in St. Louis" and "[n]either . . . Willard nor . . . Praiswater requested a hold or freeze be placed on the civil audit file." Id. at 6. "[T]hey [both] believed that the file would be returned to wherever it had originally been stored." Id. Willard's supervisor, Linda McAdon, "received the audit file on March 4, 2013, and recommended that it be

22

refiled." Id. at 16.  However, "[t]he file was ultimately destroyed at the National Archives and Record Administration facility around July 2013, without the IRS agents' knowledge."  Id.

*2. The district court proceedings*

On October 29, 2014, the criminal investigation culminated in the indictment in this case.  On February 24, 2015, Stegman moved to dismiss the indictment due to destruction of exculpatory evidence, namely the old civil audit file relating to her tax returns for 2000 and 2001.  Stegman argued that these returns "contain[ed] positions that were similar, if not identical, to the positions the Government [wa]s claiming [we]re criminal in this case and that, after the IRS put the tax returns under the microscope and summonsed financial records, the IRS . . . found the tax returns were accurate and did not assess any additional tax."  Dist. Ct. Docket No. 69 at 3.  Stegman further argued that the IRS civil audit file stemming from 2000 and 2001 was destroyed by the IRS and was thus unavailable for their review and use at trial.

The district court held an evidentiary hearing on the motion on July 14, 2015, and took the matter under advisement.  On August 21, 2015, the district court issued a memorandum and order denying the motion to dismiss the indictment.

Stegman had argued that "she had a good faith belief that she was complying with the tax laws" and that she should have been "able to rely on" the

"no change" letter issued by IRS following the 2000-2001 audit "as circumstantial evidence to support her good faith defense." Dist. Ct. Docket No. 108 at 8. But the district court concluded "that the civil audit file's exculpatory value as to a good faith defense was not obvious at the time it was destroyed." Id. More specifically, the district court noted, citing Willard's notes, that the 2000-2001 audit focused on the Anderson Ark matter and "Stegman's business expenses were not the focus of th[at] audit." Id. at 9. Thus, the district court concluded "that the purpose of the 2000-2001 civil audit was entirely unrelated to the charges at issue in this [criminal] case." Id. In addition, the district court found that the presence in the old civil audit files of information from Stegman's banks and creditors was the result of Stegman failing to cooperate initially with the civil audit, which in turn prompted the IRS to issue third party summonses for bank records and creditor information. Id. at 9-10. Further, the district court concluded that the "no change" letters sent to Stegman "would not have communicated to her any information about the substance of the audit" and instead "merely communicated the fact that there was no change to her taxes due and owing for the tax years in question." Id. at 10. Lastly, the district court concluded that the disclosure and effective use of the old civil audit file would not have "ma[d]e the difference between a conviction and acquittal for Stegman." Id.

Stegman also argued "that the information in the civil audit file about

24

checks she received from her mother, non-liquid personal property such as furs and jewelry, and cash holdings [was] exculpatory because [it] support[ed] a cash hoard defense." Id. at 11. The district court, however, concluded that Stegman had "fail[ed] to explain how a cash hoard would exculpate her given the[] [government's] allegations" that "it was not relying on the net worth method of proof in this case" and would instead rely on evidence that Stegman "mishandled income derived from her business" and "claimed personal expenditures as business expenditures on her tax returns." Id. Thus, the district court found that "[w]hile the evidence m[ight] be potentially exculpatory, Stegman ha[d] failed to establish that the civil audit file had apparent exculpatory value as to a cash hoard." Id. at 13.

In sum, the district court "f[ound] that the exculpatory value of the civil audit file was not apparent." Id. More specifically, the district court concluded that "[a]lthough the contents of the file m[ight] potentially relate to Stegman's cash hoard or good faith defenses, the record before [it] d[id] not support the conclusion that they were facially exculpatory." Id. "Moreover," the district court concluded, "even if facially exculpatory, Stegman [did] not me[et] her burden of showing she could not obtain comparable evidence through reasonable means." Id. On this point, the district court noted that "Agent Willard's fourteen pages of notes were produced to defendants and [could] be used at trial." Id. Further, "the notes indicate[d] that the documents included in the file that the

25

investigators thought m[ight] be relevant to the current investigation—tax returns, bank records, statements of asset—were obtained from third party summons" and thus could "be obtained from other sources." Id. "[I]n particular," the district court noted, "Stegman could produce evidence of her liquid and non-liquid assets in support of any cash hoard defense." Id.

The district court then turned to the question of "whether Stegman ha[d] shown that the Government destroyed the records in bad faith." Id. at 14. The court began by rejecting the notion that the government had explicit notice that Stegman believed that the civil audit file was exculpatory. Id. at 15. The civil audit file, the court noted, "contained evidence of cash and other holdings during a much earlier time frame, 2000-2003," and "this evidence was in the form of bank records and other financial documents that had been summonsed during the audit based on Stegman's initial failure to cooperate, but were not ultimately relevant to the purpose of the audit." Id. The district court further noted that "the underlying financial documents could be reasonably obtained elsewhere" because some were "public records and others could reasonably be expected to be within Stegman's possession or control." Id. at 16.

The district court also concluded there "[wa]s no evidence that the files were destroyed at the agents' direction." Id. "Neither Agent Willard nor SA Praiswater returned the file with the understanding that it would be destroyed." Id. Rather, the district court found, "[t]hey both believed from prior experience

26

that it would be refiled."  Id.

In addition, the district court concluded that "the evidence [wa]s not central to the Government's case," and "there [wa]s no indication that it plan[ned] to use any information about the civil audit to prove the charges in this case."  Id. Indeed, the court noted, "the Government ha[d] steadfastly maintained that the civil audit was completely unrelated to the charges in this case and therefore ha[d] no probative value."  Id. at 17.

Finally, the district court found "that the Government ha[d] offered an innocent explanation for the destruction of the civil audit file."  Id.  The court explained:

> The agents determined after carefully reviewing the file and preparing a written summary, that the civil audit file was neither relevant nor exculpatory to their criminal investigation.  The Court weigh[ed] heavily the fact that Agent Willard prepared a careful summary of the file and provided it to Defendants in discovery; these [we]re not actions of a person attempting to cover up exculpatory evidence.  When Agent Willard and SA Praiswater decided to close out their investigation to fraud suspense, they had to decide what to do with the civil audit file.  They decided to return the file with the expectation that it would be refiled, as this had been their experience when returning and requesting audit files in the past.  Agent Willard sent the file to McAdon in March 2013, and McAdon recommended that it be refiled.  The Government was unaware that the file had been destroyed until Defendants requested the file during discovery in December 2014.

Id.

In sum, the district court found no bad faith on the part of the agents.

27

*3. Analysis*

"The Due Process Clause imposes duties on the government not to deprive a defendant of exculpatory evidence." United States v. Harry, 816 F.3d 1268, 1276 (10th Cir. 2016). In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87.

Where, as here, a defendant "made the requisite request[] but the evidence was no longer available at that time," "the failure to preserve the evidence violates due process if the evidence was exculpatory and its exculpatory value was apparent before its loss (assuming that the evidence was 'of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means')." Harry, 816 F.3d at 1276 (quoting California v. Trombetta, 467 U.S. 479, 489 (1984)). "If, however, the exculpatory evidence was not apparently exculpatory but merely 'potentially useful,' the failure to preserve the evidence does not violate due process 'unless [the] criminal defendant can show bad faith on the part of the police.'" Id. (quoting Arizona v. Youngblood, 488 U.S. 51, 58 (1988)) (alteration in original).

28

*i. Was the civil audit file facially exculpatory?*

The district court in this case correctly observed, as we have previously held, that "[t]he government's duty to preserve extends only to evidence that 'might be expected to play a significant role in the suspect's defense.'" Id. (quoting Trombetta, 467 U.S. at 488). Stegman, as the defendant, "bears the burden of showing that the missing evidence met that standard when it was lost." Id.

Stegman argues on appeal, as she did below, that the civil audit file was "facially exculpatory." Aplt. Br. at 37. In support, Stegman points to testimony of IRS Agent Willard at the evidentiary hearing conceding that the civil audit file showed that Stegman had some cash and thus could perhaps support a cash hoard defense. Stegman also asserts that the civil audit file "contained 'no change letters'—evidence that Stegman could have introduced to establish that she relied in good faith *on the IRS's* determination that her tax positions were valid." Id. (emphasis in original).

Addressing these two arguments in order, the district court expressly rejected Stegman's argument, made below, that "evidence of a cash hoard is exculpatory as a matter of law." Dist. Ct. Docket No. 108 at 11. Thus, Stegman must point to something in addition to evidence that she was in possession of a large amount of cash. As noted, Stegman points, as she did below, to Agent Willard's testimony at the evidentiary hearing conceding that Stegman had some

29

cash and that this could conceivably support a cash hoard defense. Notably, the district court stated in its decision that it "d[id] not agree with [Stegman] that [Willard] agreed that the civil audit file contained evidence that supported a cash hoard defense in this case." Id. at 13. "To be sure," the district court stated, "Willard agreed with Stegman's attorney that the audit file contained evidence of cash, and of non-liquid holdings that could be converted to cash, but both [IRS] agents repeatedly testified that they did not believe that the audit file contained evidence that was relevant to a defense to the charges in this case, including a cash hoard defense." Id. Stegman makes no attempt on appeal to challenge the district court's findings on this point. Nor does Stegman even acknowledge, let alone address, the district court's conclusion that a cash hoard would not have exculpated Stegman because the government was not using a net worth method to prove her tax evasion, and instead was gathering and relying on evidence that she "mishandled income derived from" Midwest," took cash from Midwest, and "claimed personal expenditures as business expenditures on her tax returns." Id. at 12. Finally, Stegman fails to acknowledge, let alone challenge, the district court's finding that many of the documents contained in the civil audit file could be obtained from other sources, including Stegman herself. Id. at 13.

Turning next to Stegman's argument that the civil audit file would have supported a good faith defense, the district court specifically found that, (1) "Stegman's affidavit" in the civil audit case "was wholly concerned with the

30

Anderson Ark matter," (2) her then-attorney's "letters [in the civil audit file] all discuss his client's conduct with regard to Anderson Ark and the fact that she was a victim of the investment scheme," (3) "Stegman's business expenses were not the focus of the [prior] audit," and (4) "[t]here can be no dispute that the purpose of the 2000-2001 civil audit was entirely unrelated to the charges at issue in this case." Id. at 9. Stegman makes no attempt to challenge any of these findings on appeal. Thus, the fact that the civil audit file contained "no change" letters, standing alone, is immaterial.

The district court did not clearly err in finding "that the exculpatory value of the civil audit file was not apparent" with respect to the defenses of good faith or cash hoard. Id. at 13.

### ii. Did the IRS agents act in bad faith?

Because the civil audit file was not apparently exculpatory, "the government [could have] violated [Stegman's] right to due process only if it lost or deliberately destroyed the [file] in bad faith." Harry, 816 F.3d at 1278. As previously noted, the district court found that Stegman failed to establish that the IRS agents acted in bad faith.

On appeal, Stegman challenges this finding, arguing that "[e]ven if the civil audit files were only *potentially* exculpatory, the Government acted in bad faith, therefore requiring dismissal." Aplt. Br. at 38 (emphasis in original). In support, Stegman asserts that IRS agents "Willard and Praiswater admitted they *knew* the

31

evidence supported" her cash hoard defense. Id. at 39 (emphasis in original). Stegman also argues that "the IRS's violation of federal law prohibiting the agency from destroying records establishes *per se* bad faith." Id. at 40 (emphasis in original). But, Stegman complains, "the district court denied [her] the opportunity to establish a violation of federal law by the IRS." Id.

Addressing these arguments in order, the district court agreed that "the Government was on notice that [Stegman] advanced a cash hoard defense" before the civil audit file was returned and destroyed. Dist. Ct. Docket No. 108 at 15. "But the question," the district court concluded, was "not whether the Government was aware that Stegman was maintaining a cash hoard defense, but whether it was on notice that the information contained in the civil audit file would support that defense." Id. Although both Willard and Praiswater testified that the civil audit file "included evidence of Stegman's cash, and of her non-liquid assets that could be converted to cash," both of them "determined that the financial documents included in the audit file were not exculpatory as to the cash hoard defense." Id. Stegman points to nothing in the record that would establish that the district court's findings on this point were clearly erroneous. Indeed, the district court noted that "evidence of cash and other holdings" in the civil audit file pertained to "a much earlier time frame, 2000-2003." Id. The district court also noted that "the underlying financial documents could be reasonably obtained elsewhere," id., some being "public records and others [that] could reasonably be

32

expected to be within Stegman's possession or control." Id. at 16. Notably, Stegman makes no mention of these findings, nor does she attempt to challenge them.

As for Stegman's claim that the agency itself acted in bad faith, the district court found that "[t]he file was ultimately destroyed at the National Archives and Record Administration facility around July 2013, without the IRS agents' knowledge" and that "[t]here [wa]s no evidence that the files were destroyed at the agents' direction." Id. at 16. Although Stegman now contends that she would have presented evidence from IRS personnel "that incineration of these audit files was inconsistent with the Code of Federal Regulations provisions governing the retention of these particular records," she fails to point to any evidence establishing that the IRS itself played a role in the file's destruction.

It is also worth noting, as did the district court, that much of the information allegedly contained in the civil audit files could have been obtained by Stegman from other sources, including herself. Again, Stegman's appellate brief is silent on this point.

Lastly, Stegman argues that "the IRS's violation of federal law prohibiting the agency from destroying records establishes *per se* bad faith." Aplt. Br. at 40 (emphasis in original). We disagree. As we have noted, there is no evidence that the IRS itself played a role in the file's destruction and the district court made no such finding. Moreover, Stegman fails to cite to any authority supporting a per se

bad faith rule.

*iii. Conclusion*

In sum, we conclude that Stegman has failed to establish that the district court erred in denying her motion to dismiss the indictment due to destruction of allegedly exculpatory evidence.

*D. The admission of testimonial statements from Don Lake*

In her fourth issue on appeal, Stegman argues that the district court erred by allowing the government to introduce testimonial statements from her personal tax preparer, Don Lake, in violation of the Confrontation Clause. "[W]e review de novo to determine whether the defendant was afforded a reasonable opportunity to impeach adverse witnesses consistent with the Confrontation Clause." United States v. John, 849 F.3d 912, 918 (10th Cir. 2017).

*1. Relevant facts*

Stegman employed Don Lake as her personal tax preparer for the tax years in question. During the course of the IRS's criminal investigation, various agents interviewed Lake and Lake also responded to summonses requiring disclosure of documents related to his preparation of Stegman's personal tax returns. Stegman's defense attorneys also interviewed Lake.

Lake died in May 2015, after Stegman was indicted, but before the case proceeded to trial. Stegman responded by filing a motion in limine asking the district court to "prohibit[] the Government from eliciting evidence and/or making

34

references to any oral or written statements allegedly made by . . . Lake . . . to Government agents." Dist. Ct. Docket No. 116 at 1. The district court heard arguments on the motion on March 1, 2016, and took the matter under advisement. The district court subsequently denied the motion during trial, outside the presence of the jury.

The district court concluded "that there [we]re . . . two categories of statements" from Lake. Aplt. App., Vol. VI at 1746. "The first category," the district court concluded, "consist[ed] of documents that Lake provided to IRS agents in connection with their investigation into Stegman's taxes and notes of interviews conducted by IRS officials during which both Lake and Stegman were present." Id. "Some of the[se] documents had Lake's handwriting on them, which was identified at trial by Lake's wife; some documents contained handwriting that witnesses testified belonged to . . . Stegman." Id. The district court "allowed those documents to be admitted at trial because they [we]re not testimonial and [we]re not subject to the Confrontation Clause." Id. The district court explained that these "documents were turned over to the IRS on Stegman's behalf within the scope of Lake's power of attorney relationship with Stegman," and were also "business records, which [we]re not testimonial and [we]re not subject to the Confrontation Clause." Id. The district court also noted that "statements in Stegman's handwriting, once properly authenticated, were admissible as statements of a party opponent pursuant to Fed. R. Evid.

35

801(d)(2)(A)." Id. Lastly, the district court concluded that "Stegman was present for the interviews with IRS agents, and though Lake may have been the one talking to agents, he did so on her behalf as her power of attorney." Id. Thus, the district court concluded, "[t]he interview notes . . . contain[ed] Stegman's statements and [we]re also admissible pursuant to Fed. R. Evid. 801(d)(2)(A)." Id.

"The second category of statements," the district court concluded, "consist[ed] of statements made by Lake to IRS officials that were not truly . . . Stegman's statements." Id. "The only statement of that nature the Government sought to introduce was a statement that Lake made to IRS agents without Stegman present, stating that Samson, LLC was a Schedule E real estate business." Id. at 1746-47. The district court "did not allow that statement to be admitted at trial" for three reasons: "because Stegman was not present when Lake made the statement, her own statements about Samson, LLC contradicted Lake's statement, and Stegman had no opportunity to cross examine Lake about that testimonial statement." Id. at 1747.

*2. Analysis*

In her appeal, Stegman focuses exclusively on the district court's admission of Government Exhibit 85.[3] Exhibit 85, which was admitted through the

---

[3] At oral argument, Stegman's counsel clarified that her Confrontation Clause challenge does not extend to Government Exhibits 331 and 332.

testimony of Lake's widow, Patricia Lake,[4] was comprised of a fax cover sheet

and faxed records that Lake sent to IRS Revenue Agent Schrock during the course

of the IRS's investigation.[5] Mrs. Lake identified Lake's handwriting on the fax

cover sheet and on some of the accompanying records. Stegman objected to

Exhibit 85, arguing that the language on the fax cover sheet—"workpapers [sic]

used to prepare her 2008 tax returns"—violated her confrontation rights because

"[s]he ha[d] no idea what work papers he used, and yet they're being attributed

and used against" her. Aplt. App., Vol. VIII at 2138. The district court

concluded that all of the documents "appear[ed] to be business records . . . of the

Lake's Tax Service because there [we]re documents collected as part of the client

file." Id. at 2140. The only exception, the district court concluded, were two

pages in the exhibit that "on their face appear[ed] to be a communication from

. . . Stegman to . . . Lake." Id. The district court concluded that "these [we]re

---

[4] Mrs. Lake testified that she worked with Lake and assisted him in preparing tax returns for clients, including Stegman.

[5] The district court noted that these records included "a GMAC mortgage account," "personal property tax receipts from a state government, special assessment bills on real property," "real property tax-related documents, county tax notices, Countrywide Home Loan mortgage statement, State of Kansas vehicle registration, documents about personal property tax, Bank of America, 1099 statements," "a Schedule K-1," "a letter on the letterhead of SA Investors Group to Samson, LLC," "country treasurer records and property tax statements," "W-2s," "a modified adjusted gross income worksheet that ha[d] some computations under regular tax and alternative minimum tax" and a document from Stegman to Lake that was both typewritten and handwritten and included "itemized information." Aplt. App., Vol. VIII at 2138-39.

37

the same kind of documents that . . . Stegman would've produced directly to the IRS at their request" had Lake not been acting as her representative. Id. at 2142. And, the district court noted, although Lake's fax cover sheet referred to the documents as "workpapers [sic]," it concluded that the documents were "not work papers at all," and instead "were just documents." Id. At defense counsel's request, the district court instructed the jury regarding Exhibit 85: "I'm instructing you that when you consider this exhibit, it's not work papers, it's a number of financial documents from institutions. It's not really work papers, but it is a number of financial documents that you can fully consider." Id. at 2147.

Stegman argues in her appeal that "Lake's assertions to Government agents investigating [her] [we]re testimonial." Aplt. Br. at 43. According to Stegman, "[w]hen a preparer responds to an IRS agent's request—even in the context of a civil matter—that preparer unquestionably recognizes that his response is formal and that the primary purpose of the request is to establish the existence of some fact that is at least *potentially* relevant to a criminal investigation." Id. (emphasis in original). Stegman in turn argues that "Lake, as a retired IRS agent, no doubt appreciated the possibility of a criminal investigation based on the IRS's request for his work papers (not a common request in a routine civil audit)," and hence his "assertion to Schrock that the documents he provided were the 'workpapers [sic] used to prepare her 2008 tax returns' was a testimonial statement not subject to confrontation." Id. at 44.

38

The problem with Stegman's arguments is that she makes no attempt to challenge the district court's finding that the papers contained in Exhibit 85 were, save for the fax cover sheet, Stegman's financial documents rather than Lake's work papers. And, in turn, she makes no attempt to explain how such financial documents were testimonial in nature. As for the fax cover sheet that contained Lake's handwriting, we agree with the district court that it was not testimonial in nature either. The Confrontation Clause, the Supreme Court has emphasized, "reflects an especially acute concern with a specific type of out-of-court statement." Crawford v. Washington, 541 U.S. 36, 51 (2004). In particular, it is focused on "[a]n accuser who makes a formal statement to government officers" and thus "bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." Id. In other words, testimonial statements are those that the declarant "would reasonably expect to be used prosecutorially." Id. Applying these principles to Lake's notation on the fax cover sheet, we are not persuaded that it was testimonial. Specifically, Lake's notation was "cooperative and informal [in] nature" and there is no indication that Lake would have reasonably expected the notation "'to be used prosecutorially.'" United States v. Wilson, 788 F.3d 1298, 1316 (11th Cir. 2015) (quoting Crawford, 541 U.S. at 51). As a result, we conclude that the admission of the fax cover sheet did not violate Stegman's rights under the Confrontation Clause.

Finally, to the extent that Stegman argues that Lake's act of production in response to the IRS summons was testimonial, that argument was not raised in the district court and fails under plain error review. See generally Molina-Martinez v. United States, — U.S. —, 136 S. Ct. 1338, 1343 (2016) (discussing the conditions that must be met to establish plain error). At a minimum, Stegman, who does not cite to a single case in support of this argument, cannot establish that any error in admitting evidence of Lake's act of production was plain.

*E. Stegman's advisory sentencing range*

In her final issue on appeal, Stegman argues that the district court erred by miscalculating her advisory sentencing range under the Sentencing Guidelines. More specifically, Stegman asserts that "the district court improperly calculated the intended tax loss and improperly applied the sophisticated means and obstruction of justice enhancements" in calculating her advisory Guidelines sentencing range. Aplt. Br. at 50.

"We review sentencing decisions for 'reasonableness under a deferential abuse-of-discretion standard.'" United States v. Anwar, 741 F.3d 1134, 1136 (10th Cir. 2013) (quoting United States v. Begaye, 635 F.3d 456, 461 (10th Cir. 2011)). Although "[r]easonableness review is a two-step process comprising a procedural and a substantive component," id. (quoting United States v. Halliday, 665 F.3d 1219, 1222-23 (10th Cir. 2011)), Stegman challenges only the procedural reasonableness of her sentence, i.e., whether the district court properly

40

calculated her advisory Guidelines range. "Procedural reasonableness 'requires, among other things, a properly calculated Guidelines range.'" Id. (quoting United States v. Mollner, 643 F.3d 713, 714 (10th Cir. 2011)). In reviewing a district court's calculation of a defendant's advisory Guidelines range, this court reviews legal questions de novo and factual findings for clear error, giving due deference to the district court's application of the guidelines to the facts. Id.

*1. Calculation of intended tax loss*

Section 2T1.1 of the Sentencing Guidelines applies to tax-related crimes such as those that Stegman was convicted of violating. It directs a district court, in calculating a defendant's advisory Guidelines sentencing range, to apply a base offense level "from § 2T4.1 (Tax Table) corresponding to the tax loss." U.S. Sentencing Guidelines Manual § 2T1.1(a)(1) (U.S. Sentencing Comm'n 2013). For "offense[s] involv[ing] tax evasion or a fraudulent or false return, statement or other document, the tax loss is the total amount of loss that was the object of the offense (i.e., the loss that would have resulted had the offense been successfully completed)." Id. § 2T1.1(c)(1). "If the offense involved . . . both individual and corporate tax returns, the tax loss is the aggregate tax loss from the offenses added together." Id. § 2T1.1(c)(1), note (D).

The district court in this case found that "the corporate tax loss and the individual tax loss [we]re inextricably intertwined." Aplee. App. at 276. The district court explained:

41

The individual tax liability is based on what happened at the corporation. Ms. Stegman, the evidence showed, obtained income through the corporation in the form of diverting cash that was supposed to go to the corporation that never hit the corporation's books or – or bank account, for that matter, but went into Samson's bank account or her own bank account that she controlled.

The corporation expended monies on her behalf, either through cash transactions or through credit cards– payments on credit cards that were in her name. So in other words, in order to determine what her tax liability is, one has to start with an analysis of the corporate tax liability. And then the next step being what dividends – distributions in the form of dividends or returns of capital contributions or capital gains should be recognized as income to Ms. Stegman. So these things are inextricably intertwined.

Ms. Stegman obtained personal benefit by using [Midwest] essentially, as the government characterizes it, as her own bank account, as her own cash piggy bank. She used that corporation to pay her personal expenses. She skimmed a lot of cash out of that corporation and paid it to herself without any record and without any payment of tax by her or the corporation on the tax receipts – or on the cash receipts that the corporation received.

So in that sense, it's clearly a part of the same course of conduct or common scheme or plan and so both should be considered. It also meets the definition of relevant conduct under the relevant conduct guideline. And there's no caveat or limitation in terms of whether it was reasonably foreseeable to her. That particular language goes to jointly undertaking the activity.

Id. at 236-237.

On appeal, Stegman argues that "[t]he district court improperly included

the alleged intended corporate tax loss of MMACPA after granting [her] motion

for judgment of acquittal as to all corporate tax evasion counts." Aplt. Br. at 50.

In support, she argues that "she was acquitted of all corporate tax evasion

42

counts—*not* because the Government proved what was alleged only by a preponderance of the evidence but not beyond a reasonable doubt, but because the Government completely failed to prove what it alleged." Id. at 52 (emphasis in original). Consequently, Stegman argues, "the Government, at most, established an intended tax loss amount of approximately $68,000 for the two counts of conviction." Id. at 53.

We disagree. At the time of sentencing, the district court acknowledged that it had acquitted Stegman of the two counts of corporate tax evasion found by the jury. The court explained, however, that it did so not because there was a lack of "proof beyond a reasonable doubt that th[e] corporation evaded taxes," but rather because the indictment itself was flawed in attributing the loss as due and owing by . . . Stegman, when actually it was due and owing by the corporation. Aplt. App., Vol. 12 at 3314. The district court nevertheless concluded that, for purposes of calculating Stegman's sentence, it was "appropriate [under the Guidelines] to aggregate the tax loss of both corporation and individual." Id.

Quite clearly, § 2T1.1 directs a district court to consider "the aggregate tax loss from the offenses added together" if the offense involved "both individual and corporate tax returns." U.S. Sentencing Guidelines Manual § 2T1.1(c)(1)(D) (U.S. Sentencing Comm'n 2013). Further, Application Note 2 states, in pertinent part, that "[i]n determining the total tax loss attributable to the offense (see § 1B1.3(a)(2)), all conduct violating the tax laws should be considered as part of

the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated." Id., § 2T1.1 cmt. n.2. In addition, § 1B1.3(a)(2), which is referenced in Application Note 2, states that a defendant's base offense level shall be determined on the basis of "all acts and omissions" committed by the defendant "that were part of the same course of conduct or common scheme or plan as the offense of conviction." Id. § 1B1.3(a)(2). And that is consistent with our precedent, which holds that a district court may consider as relevant conduct "unindicted, dismissed, or acquitted conduct." United States v. Rodebaugh, 798 F.3d 1281, 1300 (10th Cir. 2015).

Here, Stegman does not seriously dispute the district court's factual findings that the corporate and individual tax losses at issue were inextricably intertwined. Consequently, we conclude that the district court did not err in utilizing the aggregate loss to determine Stegman's base offense level.

*2. Sophisticated means enhancement*

Section 2T1.1(b)(2) of the Sentencing Guidelines states that if a tax-related "offense involved sophisticated means, increase [the base offense] level by 2 levels. If the resulting offense level is less than level 12, increase to level 12." U.S. Sentencing Guidelines Manual § 2T1.1(b)(2) (U.S. Sentencing Comm'n 2013). Application Note 5 to § 2T1.1 states that "'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the

44

execution or concealment of an offense" and includes "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." Id., cmt. n.5 (emphasis omitted).

The district court in this case concluded that the "sophisticated means" enhancement applied to Stegman. Although Stegman objected to application of the enhancement, the district court rejected Stegman's objection:

> This is not a case in which the only evidence as to the execution or concealment of the tax fraud pertained to Ms. Stegman simply not providing her accountant with information about income or expenses, either individual or for purposes of the corporate return. There was evidence in this case of an active and complicated scheme to conceal assets. And some of – conceal assets and conceal income. Some of it in the context of the investigation itself.
>
> So, for example, after Ms. Stegman was aware that there was a criminal investigation, she told her tax preparer, I believe it was Mr. Mendoza at that point, "We need to clean this up," and sent him an e-mail and some information regarding that. The altered ledgers were in the context of knowing that there was an investigation underway. But even before that, there was the creation of multiple LLCs. The primary one used, of course, was Samson, that was used to divert checks that should've been written to [Midwest] for services received but were paid to Kathleen Stegman by use of her stamp and then deposited in the Samson account.
>
> To be sure, Samson was claimed on a couple of these tax returns, but Ms. Stegman also indicated to one or more of her tax return preparers that Samson was just a name on a bank account. Well, actually that's what she told the IRS, that Samson was just a name on the bank account, it had no business purpose. She made inconsistent statements at other times about Samson and claimed that it did marketing and advertising and actually had a business purpose.
>
> But the evidence at trial showed that Samson's primary use was apparently to divert money from [Midwest] and use of its bank

account so that receipts from [Midwest] went into Samson. There were other entities and other LLCs used as well, although Samson was the primary one that was used for at least diversion of money.

There were – there was evidence about straw purchases. Tony Felitsky buying the yacht. He couldn't afford the yacht. He was in the middle of a divorce, he had no money. There was some suggestion he had reason to want to hide the fact that he was buying the yacht, but there was also evidence that he didn't have any money and that he didn't really use the yacht. And I think it was Ms. Stegman's brother that testified that it was her yacht. Everyone – and her employees testified it was her yacht. Everyone understood it was her boat, not Mr. Felitsky's. She used him as a straw purchaser. There was also straw purchases of gold through others, including one or more of her boyfriends.

The use of the money orders one could definitely call structuring. I mean, it's way below the structuring limit and it was driven not so much it seems to be by the – the reporting requirement as it was the fact that money orders couldn't be purchased for more than $300 or $500, depending on the outlet. But it – it was a mechanism by which she didn't have to report. And there really, in my view, was no reasonable explanation for somebody driving all over Leawood and Overland Park buying money orders at every Hen House and Hy-Vee in town to, in turn, use to – to make gold purchases and to pay off a yacht and to other – to make payments on other personal items to her own benefit.

Why spend the time? Why go through all of this? Why have employees involved in buying money orders? Why use their name, family members' names, LLC's names, everyone's name but her own name to buy money orders unless she was trying to hide the fact that she was using cash from [Midwest] for personal – for personal expenses and assets.

In that sense, it's not an offshore account. Or there are schemes that are clearly more sophisticated and more complex in terms of using, you know, layers and layers of fictitious entities. But in this case, Ms. Stegman didn't just use entities, she used people and layers and layers of people, employees, boyfriends, LLCs, and engaged in what must've been a pretty time-consuming enterprise to

46

essentially launder the money that she skimmed from [Midwest] through money orders in very small amounts.

In that sense, and the totality of the evidence which I must consider, it was complicated, it was complex, it was – it was labor-intensive, and it was effective. So I think the sophisticated means enhancement is appropriate and I'll overrule and deny that objection.

Aplee. App. at 229-234.

In her appeal, Stegman challenges the district court's findings and application of the enhancement. To begin with, Stegman argues that "[t]he individual tax evasion counts essentially boiled down to the Government's theory that [she] did not disclose income to her preparer, Lake." Aplt. Br. at 53. Such conduct, she argues, "is insufficient to trigger th[e] [sophisticated means] enhancement" because "not telling someone something is hardly sophisticated." Id. at 53-54. Further, she argues, the creation and use of "multiple LLCs does not, by any means, make her offenses 'sophisticated.'" Id. at 54. According to Stegman, "the formation of an LLC [is] straightforward," and "the LLCs [she] formed had legitimate business purposes and were unambiguously registered to her." Id. Lastly, Stegman argues that the district court improperly considered her "alleged cash expenditures in applying this enhancement," even though "the IRS destroyed evidence that negated the Government's theory that [she] had $0.00 at the beginning of tax year 2006." Id.

Addressing these arguments in order, it is clear from the record that the district court based application of the sophisticated means enhancement on more

47

than Stegman simply withholding information from Lake, her personal tax preparer. In particular, the district court pointed to what it characterized as Stegman's "active and complicated scheme to conceal assets" and income. Aplee. Supp. App. at 229. Part of that scheme, the district court noted, "was the creation [and use] of multiple LLCs." Id. at 230. Although it is undisputed that these LLCs were registered to Stegman, no one but her knew that she was diverting income from her business to Samson, or that she was using the other LLCs to disguise information when it served her purposes. Moreover, the district court expressly found, and Stegman has made no attempt to dispute, that "Samson's primary use was apparently to divert money from [Midwest] and use of its bank account so that receipts from [Midwest] went into Samson." Id. at 230-231. The district court also found, and Stegman again does not dispute, that she used employees of her business to purchase money orders in order to conceal income from the business. In sum, the district court found, and Stegman does not seriously dispute, that "she used people and layers and layers of people, employees, boyfriends, LLCs, and engaged in . . . a . . . time-consuming enterprise to essentially launder the money that she skimmed from [Midwest] through money orders in very small amounts." Id. at 232.

That leaves only Stegman's argument that it was improper for the district court to consider her cash expenditures because "the IRS destroyed evidence that negated the Government's theory that [she] had $0.00 at the beginning of tax year

48

2006." Aplt. Br. at 54. This argument is patently absurd. Even assuming, for purposes of argument, that the old civil audit file contained information outlining the amount of cash that Stegman had on hand, that information would have been irrelevant because the audit occurred in 2004 and 2005 and pertained to the years 2000 and 2001, well before the conduct at issue in this case. Moreover, the district court expressly found, and Stegman does not dispute, that all of the information in the old civil audit file was available from other sources, including Stegman herself.

Thus, in sum, we conclude that the district court did not err in applying the sophisticated means enhancement under § 2T1.1(b)(2).

*3. Obstruction of justice enhancement*

Section 3C1.1 of the Guidelines directs a district court to "increase [a defendant's] offense level by 2 levels" if "the defendant willfully obstructed or impeded, or attempted to obstruct or impeded, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction" and "the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct" or "(B) a closely related offense." U.S. Sentencing Guidelines Manual § 3C1.1 (U.S. Sentencing Comm'n 2014).

The district court in this case found that Stegman obstructed the IRS's investigation in three ways: directing employees to shred receipts that documented cash that she received from her business, altering Midwest ledger

49

entries (specifically, 2010 Midwest ledgers) to change the characterization of the way certain expenses were entered so that they appeared to be legitimate business expenses, and directing a witness, Dr. Evelyn Clark, to testify that she did not remember her business relationship with Midwest. Aplt. App., Vol. 12 at 3241-44.

On appeal, Stegman argues that all of these acts of obstruction related solely to Midwest's finances and taxes, and not to her acts of personal tax evasion. Thus, she argues, the acts did not relate to "the instant offense of conviction." As previously discussed, however, the district court expressly found that the acts of corporate and personal tax evasion were inextricably intertwined and Stegman does not dispute this finding. Moreover, the district court found, and Stegman does not dispute on appeal, that the act of shredding corporate receipts "directly related to [Stegman's] tax liability because she didn't claim as dividends, as salary, as any sort of income, cash that she skimmed and took from the corporation." Id. at 3245. The district court also found, again without dispute from Stegman on appeal, that in 2010 Midwest's ledgers were changed so that "things were being hidden in terms of the real characterization, how money was being expended," and "[b]y and large it was being expended . . . for the personal benefit of . . . Stegman, not for any business expenses." Id. at 3243.

Stegman also argues that any attempt she made to tamper with Clark's testimony was unsuccessful because Clark told investigators that she couldn't

50

recall what happened when she was a client of Midwest.  Notably, the district court found that even if Stegman's attempt to influence Clark's testimony was unsuccessful, it nevertheless was an attempt to obstruct justice that fell squarely within the scope of § 3C1.1.  Id. at 3244.  Notably, Stegman fails to address this "attempt" finding.

We therefore conclude that the district court did not err in applying the obstruction of justice enhancement.

III

The judgment of the district court is AFFIRMED.